UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    CRIMINAL NO. 07-297 (DWF/JSM)

      Plaintiff,

v.                                           <u>REPORT AND RECOMMENDATION</u>

JOE DARRELL EDWARDS, JR. (3)

      Defendant.

      JANIE S. MAYERON, United States Magistrate Judge

The above matter came on before the undersigned upon defendant Joe Darrell Edwards's Motions: for Suppression of Confessions or Statements [Docket No. 209]; to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 212]; for Suppression of Records of Electronic Surveillance [Docket No. 214]; to Dismiss Counts 1, 2, and 9 [Docket No. 215]; to Strike Surplusage [Docket No. 216]; Supplemental Motion to Dismiss Counts 1, 2 and 9 [Docket No. 318]; and to Suppress Witness Identifications [Docket No. 321].   This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1.

Assistant United States Attorney David Steinkamp appeared on behalf of the Government; Attorney Jordan Kushner appeared on behalf of defendant Joe Darrell Edwards, who was personally present.

Based upon the pleadings, testimony taken at the hearings, exhibits submitted at the hearings, pre-hearing submissions, and post-hearing submissions, IT IS RECOMMENDED that:

1.     Joe Darrell Edwards's Motion for Suppression of Confessions or Statements [Docket No. 209] be **DENIED**;

2.     Joe Darrell Edwards's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 212] be **DENIED**;

3.     Joe Darrell Edwards's Motion for Suppression of Records of Electronic Surveillance [Docket No. 214] be **DENIED** as moot based on the pre-hearing submission of the Government and the representations of defendant's counsel during the hearing;

4.     Joe Darrell Edwards's Motion to Dismiss Counts 1, 2, and 9 [Docket No. 215] be **DENIED**;

5.     Joe Darrell Edwards's Motion to Strike Surplusage [Docket No. 216] be **DENIED**;

Joe Darrell Edwards's Supplemental Motion to Dismiss Counts 1, 2 and 9 [Docket No. 318] be **DENIED**; and

6.     Joe Darrell Edwards's Motion to Suppress Witness Identifications [Docket No. 321] be **DENIED**.

I.     **FACTUAL BACKGROUND**

Defendant has been indicted on two counts of conspiracy relating to the distribution of narcotics ranging over a seventeen-year period.  See Indictment, Counts

1 and 2.   Defendant was also charged with one count of aiding and abetting the distribution of narcotics on October 15, 2005.   <u>See</u> Indictment Count 9.   Defendant now seeks an order from the Court dismissing the Indictment against him on numerous grounds and seeks the suppression of a myriad of evidentiary items and statements arising from incidents that occurred between 1994 through 2006.

### A.   <u>Incident of August 13, 1994</u>

Officer Christopher Abbas, with the Minneapolis Police Department, testified that on August 13, 1994, at approximately 11:00 p.m., he and his partner responded to a loud party call at an apartment complex located in Minneapolis, Minnesota.   Tr. 118-19. They had received a tip from a caller that a loud party was taking place in Apartment 305.   Tr. 119.   The officers discovered that the commotion was actually emanating from Apartment 303.   <u>Id.</u>   Officer Abbas testified that a person who came out of Apartment 303 started yelling, "Oh, shit.   It's 5-0.   Fuck!   It's 5-0."   Tr. 120.   According to Officer Abbas, the phrase "5-0" is a common reference for the police.   <u>Id.</u>   People from other apartments began coming out to see what was going on.   <u>Id.</u>   The officers knocked on the door of Apartment 305, and Marquise Bowie answered the door.   Tr. 121.   Bowie proceeded to tell the officers that they had turned down the "fucking music" and then slammed the door in their face.   Tr. 121.   The officers noticed that the individual who had been yelling "5-0" had returned to the hallway and got into a physical altercation with Officer Abbas' partner.   Tr. 122.   Officers placed the individual against the wall and patted him down for officer safety.   <u>Id.</u>

While the officers were dealing with the individuals in the hallway, the door to Apartment 303 opened and defendant appeared at the door with another person.  Tr. 123.  Defendant told the other individual, "Ferguson," to, "[g]o get the gun. We'll handle this."  <u>Id.</u>  Officer Abbas testified that Ferguson disappeared behind Edwards and that he could not see where Ferguson went because defendant was standing in the doorway.  Tr. 136.  The officers were not questioning defendant when he made this statement, defendant was not under arrest or detained and the officers were outside of the apartment unit when he made the statement.  Tr. 123.  Officer Abbas testified that defendant initiated the conversation with police by making this statement.  Tr. 136.  Officer Abbas stated that he took this statement by defendant seriously and that he was concerned for his safety, his partner's safety and the safety of those individuals in the hallway because he believed there was a gun in the apartment.  Tr. 124-25.  Officer Abbas did not take defendant into custody at that point.  Tr. 136.  Officer Abbas then asked defendant for the resident of the apartment; defendant told him that she was not at home, and that he was left in charge.  Tr. 124.  At this point, Officer Abbas asked defendant to step out into the hallway so Officer Abbas could issue defendant a citation for violating the party ordinance.  Tr. 125.  Officer Abbas testified that although he was giving defendant a citation for the loud party, it did not alleviate his concerns about his safety.  Tr. 141.  Officer Abbas then tried to get defendant out of the doorway so the officer could do a sweep of the apartment for their safety.  Tr. 126.  First, Officer Abbas asked defendant to step aside from the doorway, however, defendant refused.  Tr. 142-43.  Then Officer Abbas grabbed defendant, who was blocking the way into the

4

apartment, so he could view the interior of the apartment.  Tr. 126.  At this point, Officer Abbas stated that he observed other individuals inside the apartment running towards the back of the apartment.  Tr. 126-27.  This raised further concerns for Officer Abbas that someone was going to retrieve a gun.  Tr. 127.  .

The officers entered the apartment and removed all of the individuals inside.  Tr. 128, 140.  They did not receive permission from anyone to enter the apartment.  Tr. 138.  Once everyone had been removed from the apartment, they did a protective sweep of the apartment, at which time they found a .38 special or a .38 revolver sitting on a bed in the apartment in plain view.  Tr. 128, 140.  The weapon recovered was loaded.  Tr. 129-30.

According to Officer Abbas, less than two minutes elapsed from the time defendant stated to "go get the gun" to when the officers conducted the protective sweep.  Tr. 127.  Officer Abbas testified that they called for two sets of backup officers in order to control the scene, once before they entered the apartment and once after the sweep of the apartment.  Tr. 129.  Officer Abbas testified that the purpose of the sweep was to ensure that none of the occupants inside the apartment had a gun that would be used to harm officers when they were in the hallway trying to issue a citation and identify the occupants.  Tr. 146.  Defendant was booked on weapons possession and obstructing legal process with force.  Tr. 129.

### B.    May 7, 1996 Statement

Donald Rothstein, Assistant Director of the Office of Special Investigations, testified that inter-gang and intra-gang disputes are common at correctional facilities.

Tr. 180-181.  Rothstein also stated that investigators monitor inmate membership in security threat groups, such as gangs, for the safety and security of the facility.  Tr. 179. In particular, by knowing gang affiliation, prison faculty can ensure that they are not housing gang members together, can control the number of gang members in the prison and control the number of gang members participating in the same work area, religious services or educational programs.  Tr. 179-180.

According to Rothstein, when a new inmate first comes into the St. Cloud Correctional Facility, they must complete an intake interview, which includes an inquiry into whether they are affiliated with any gang, group or organization.  Tr. 182.  This question is asked in order to ensure inmate safety -- so they are not exposed to rival gang members -- and to avoid getting large numbers of the same gang into the prison system.  Tr. 183.  The questions are not asked to gather information about a particular crime.  Id.  Defendant's "Intake Interview Sheet" dated May 7, 1996 indicated that he identified himself as a member of the Bloods Gang and that his nickname was "JODEBE".  See Government Ex. 1.

### C.    April 17, 1998 Incident

Officer Mike Bakken, with the Minneapolis Police Department, testified that on April 17, 1998, he was on patrol in his squad car in the area of 34th Street and Columbus South at 1:30 a.m., when he observed a vehicle make a traffic violation.  Tr. 62.  In particular, the vehicle failed to come to a stop at a stop sign and turned without a signal.  Tr. 67.  The area where the stop occurred was known for the street-level distribution of narcotics, including marijuana and cocaine, and a shooting had recently

occurred in the area.   Tr. 85.   Officer Bakken pulled the vehicle over and approached the driver's side of the vehicle.   Tr. 62-63.   The driver identified himself as Alex T.J Wright.   Tr. 63.   Officer Bakken discovered that Wright did not have a driver's license on his person and that his license had been suspended.   Tr. 63, 67.   Officer Bakken had Wright step out of the car and searched his person.   Tr. 63.   Officer Bakken discovered what looked like marijuana and crack cocaine on Wright's person.   Id.

Officer Bakken testified that he asked the other passengers in the vehicle, including defendant, to step out of the vehicle after the contraband had been discovered.   Tr. 64.   Defendant was seated in the front passenger seat of the vehicle. Tr. 82.   Defendant was asked for his identify and then patted down. Tr. 90.   During the pat down, officer found a yellow copy of a Minnesota Driver's license registration form with the name of Marquise Bowie on it.   Tr. 65, 90.   Id.   Defendant verbally identified himself and then he was placed in the back of the squad car.   Tr. 65, 69.   Officer Bakken could not recall whether defendant had verbally identified himself as Edwards or had provided his full name.   Tr. 87.   Defendant was not under arrest at this time.   Tr. 77, 83.   Officer Bakken detained defendant while the officers were investigating the vehicle. Tr. 83.   Officer Bakken also confirmed defendant's identity by running the name he gave through the state's computer.   Tr. 79.

The occupants of the vehicle claimed that Bowie was the owner of the car, but Bowie was not in the vehicle.   Tr. 65.   Officer Bakken ran the license plate and the vehicle came back belonging to a party not registered under the name of Bowie.   Id.

Because no one in the vehicle had a valid driver's license and because the owner was not present, Officer Bakken decided to tow the vehicle to the Minneapolis impound lot, which was what he would typically do in this situation.  Tr. 65.  Prior to the tow, Officer Bakken conducted an inventory search of the vehicle and discovered a gun hidden underneath the center part of the front dash.  Tr. 66, 75, 80.  Officer Bakken testified that the handgun was within reach of either the driver or the front passenger. Tr. 86.  Defendant and Wright were arrested after the handgun was discovered.  Id.

D.    **Incident of September 5, 1999**

Officer Dante Dean, with the Minneapolis Police Department, testified that on September 5, 1999, at approximately 2:00 a.m., he was on patrol in the area of 33rd Street and 5th Avenue South in Minneapolis.  Tr. 221-22.  During this time, he observed a vehicle driving erratically by squealing its tires as it was turning corners and in manner that was in violation of the traffic laws.  Tr. 222.  Officer Dean pulled up behind the vehicle and it proceeded to speed up and make several more erratic turns.  Tr. 224. When Officer Dean got ready to pull the vehicle over, it sped up, changed lanes and started to drive even more erratically.  Id.  Officer Dean then turned on his emergency equipment.  Id.  The vehicle responded by speeding up.  Id.  According to Officer Dean, there were other vehicles in the vicinity of the pursuit, and a rear-end crash between the suspect vehicle and another vehicle almost occurred.  Tr. 241.  The chase lasted approximately 10-15 minutes when the vehicle struck a gas meter in a library parking lot, the driver got out of the vehicle and started running.  Tr. 225, 253.  Officer Dean testified that he got a good look at the driver when the suspect exited the vehicle.  Tr.

8

226.  Officer Dean chased the driver on foot and when he cut behind a house to catch the driver, the driver took off his shirt in order to fool Officer Dean as to his identity.   Tr. 226.   Officer Dean apprehended the driver and placed him under arrest for failing to yield to an emergency vehicle or fleeing.   Tr. 227.   The driver, later identified as defendant, was not the owner of the vehicle. Tr. 228.  Officer Dean delivered defendant to the Hennepin County Jail and did not take a statement from him.  Id.

Officer Bradley Simonson, with the Minneapolis Polices Department, testified that he took a statement from defendant on September 5, 1999 at the Hennepin County Jail. Prior interviewing defendant, Officer Simonson read defendant his Miranda rights.  Tr. 172.  After being read his Miranda rights, defendant agreed to talk to Officer Simonson. Tr. 173.  At no time did defendant ask for counsel.  Tr. 173.  Officer Simonson made no promises or threats to defendant.  Id.   Officer Simonson testified that he terminated the interview immediately when defendant stated that he was done answering questions. Tr. 174.

**E.     Incident of January 8, 2000**

Officer Dean testified that on January 8, 2000, at approximately 2:40 a.m., he was dispatched to a disturbance in South Minneapolis at 44th and Bloomington, which was behind a church.  Tr. 229.  When Officer Dean arrived in his marked squad car, he observed a vehicle occupied by several people.   Tr. 230.   Officer Dean placed his spotlight on the vehicle and noticed that the occupants tried to duck out of sight, in a manner that raised Officer Dean's suspicions that they were trying to hide something from him like drugs or a gun.  Tr. 230-31.  According to Officer Dean, the individuals

were not engaged in this behavior before they knew that the officer was watching them. Tr. 231.

Officer Dean approached the driver's side of the vehicle with his gun drawn.  Id. He identified the driver as John Cone Wade.  Id.  Officer Dean testified that Wade's eyes were bloodshot and watery, that he appeared nervous and that the smell of alcohol was emanating from the vehicle.  Tr. 232.  Officer Dean also observed a bottle of whiskey and beer box inside of the vehicle.  Tr. 234-35.  In addition, Officer Dean observed another occupant in the vehicle, Larry Tyus, trying to open the car door and get out.  Tr. 232.  Officer Dean Ordered Tyus to shut the door and place his hands where he could see them.  Id.  The other occupants remained still.  Id.

As Officer Dean took the driver out of the vehicle, Tyus opened up his door and started running.  Tr. 233.  Officer Dean testified that he knew that Tyus was a Bloods Gang member.  Id.  Officer Dean was concerned for his safety and called for other squads in order to secure the other occupants in the vehicle.  Tr. 234.  After Wade had been detained, Officer Dean stated that he observed beer bottles inside the vehicle.  Tr. 236.  The vehicle keys were also observed inside the car.  Tr. 250.  Officer Dean asked the occupants of the vehicle who owned the car.  Tr. 236.  The occupants told Officer Dean that a girl, who they claimed had left before the police officer arrived, owned it.  Tr. 236.  Officer Dean decided to have the vehicle towed, given the presence of alcohol containers, that the owner of the vehicle was not present, the keys were present and none of the occupants had valid driver's licenses.  Tr. 236-37, 250.  Officer Dean claimed that he had a concern that the vehicle might be stolen.  Tr. 250.  The occupants

were detained and Officer Dean then conducted an inventory search of the vehicle prior to having it towed.  Tr. 237.   During the inventory search, Officer Dean discovered a semi-automatic handgun underneath the front passenger seat.  Tr. 238.   Defendant had been sitting in the rear of the vehicle.  Id.  During the incident, defendant told Officer Dean that Tyus was a Bloods Gang member.  Tr. 238-39.   Edwards was not placed under arrest and he was allowed to leave the scene.  Tr. 239.

### F.    June 4, 2000 Incident and June 5, 2005 Statement

Officer Christopher Carson, with the Minneapolis Police Department, testified that on June 4, 2000, he was on patrol in his marked squad car in the area of South Minneapolis near 36th Street and 12th Avenue South.  Tr. 152-53.   He was patrolling this area because it was known to be a street-side narcotics trafficking area, where people would flag down cars to deal for narcotics.  Tr. 153.   Officer Carson testified that he observed defendant on the sidewalk on June 4, 2000.  Id.  He observed defendant flagging down a vehicle, which in Officer Carson's experience was one of the things people do when they are dealing drugs at the street level.  Tr. 153-54.   Officer Carson stated that he recalled defendant reaching into the car window but could not recall seeing any drug transaction take place.  Tr. 159-60, 166.

At this point, Officer Carson pulled his squad car next to defendant in order to conduct a further investigation.  Tr. 154-55.   Defendant was still next to the vehicle he had flagged down.  Tr. 160.   As Officer Carson exited the vehicle, defendant started running.  Tr. 155.   Officer Carson ordered defendant to stop.  Tr. 161.   Officer Carson then told defendant that he was under arrest.  Tr. 162.   As Officer Carson chased

defendant, he observed him reach towards his waistband and it appeared that he was holding something while he was running, which appeared to be a gun.  Tr. 155.  Officer Carson observed defendant jump over a fence, stop and then drop something.  Tr. 156. Officer Carson testified that he did not touch defendant prior to him dropping the object. Tr. 164.  Officer Carson ultimately caught defendant.  Tr. 156.  When Officer Carson went back to the fence where defendant had dropped something, he discovered a small handgun.  Id.  Officer Carson placed defendant under arrest for possession of a firearm. Id.

Retired Minneapolis Police Investigator Clay Pecore testified that he interviewed defendant on June 5, 2000 regarding his arrest for possession of a firearm.  Tr. 279. The interview took place in an interview room at the Hennepin County Jail.  Id. Investigator Pecore was in plain clothes during the interview and was not carrying a weapon during the interview.  Tr. 279-80.  The interview was recorded as soon as Investigator Pecore entered the interview room.  Tr. 279, 282.

Investigator Pecore initially obtained biographical information from defendant, per procedure.  Tr. 280.  Investigator Pecore then read defendant his Miranda rights and defendant agreed to speak with Investigator Pecore after hearing his rights.  Id. Defendant never asked for an attorney nor did he at anytime tell Investigator Pecore that he longer wished to speak to Investigator Pecore.  Tr. 281.  Investigator Pecore terminated the interview with defendant.  Investigator Pecore testified that defendant was able to comprehend what was going on and that he appeared to be lucid throughout the entire interview.  Id.

**G.**   **October 15, 2005 Incident and October 17, 2005 Statement**

Officer Jeffery Peterson, with the Minneapolis Police Department, testified that on October 15, 2005, at about 9:58 p.m., he received a call from dispatch regarding a customer fighting with an employee at the Green Mill restaurant located on Hennepin Avenue in Minneapolis.  Tr. 104, 108.  When Officer Peterson arrived, he observed that the Green Mill Manager was on top of defendant out in the parking lot.  Tr. 104.  The two appeared to be struggling.  Tr. 113-14.  Officer Peterson handcuffed defendant and placed him in the rear of the squad car.  Tr. 104.  Office Peterson did not ask any questions of defendant before placing him into the squad car.  Tr. 108.  Officer Peterson testified that his first priority was to make the scene safe before he started an investigation and that he was concerned for his safety and that of the public due to the fight.  Tr. 109, 114.  Officer Peterson also testified that defendant was not under arrest at this point.  Tr. 110.

Once defendant was in the squad car, the manager told Officer Peterson that he had told defendant to leave earlier in the night, which defendant did.   Tr. 105.  Defendant returned later and was again asked to leave, but he refused.  Id.  At that point, the manager grabbed defendant in an escort hold and began taking him out of the restaurant and as he was doing so, defendant struck the manager in the face with a closed fist.  Id.  The manager filled out a citizen's arrest form.  Id.

Officer Peterson checked defendant's status and discovered that he had two outstanding Hennepin County arrest warrants.  Tr. 106.  This occurred 10 minutes after first detaining defendant.  Tr. 115.  Defendant was arrested based on the outstanding

13

arrest warrants and for the assault on the manager based on the citizen's arrest.   Tr. 106.

Defendant was subjected to search of his person during his booking into Hennepin County Jail.   Tr. 107.   Officer Peterson testified that two rocks of crack cocaine were discovered inside of his sock.   Id.   Defendant was then arrested for possession of a controlled substance.   Id.

Officer Kelly Kasel, with the Minneapolis Police Department, testified that she interviewed defendant in an interview room located at the Hennepin County Jail on October 17, 2005.   Tr. 168.   Officer Kasel explained to defendant the reason for being there and sought biographical information from defendant.   Tr. 170.   Prior to questioning defendant, Officer Kasel read defendant his <u>Miranda</u> rights.   Tr. 168.   Defendant agreed to speak with Officer Kasel after receiving his <u>Miranda</u> warning.   Id.   At no time did defendant ask for an attorney, to remain silent or to discontinue the interview.   Tr. 169. No threats or promises were made to defendant.   Tr. 169-71.   Officer Kasel ended the interview by asking defendant if he gave his statement of his own free will, to which defendant said "yes".   Tr. 169.

### H.   December 21, 2005 Statement

Officer Mark Johnson, with the Minneapolis Police Department, testified that on December 21, 2005, he transported defendant to jail in connection with his arrest for possession of crack cocaine.   Tr. 96.   Officer Johnson stated that defendant told him, "are you going to take me down for just two pills?"   Tr. 97.   Officer Johnson did not give defendant a <u>Miranda</u> warning prior to defendant's statement.   Tr. 96.   Officer Johnson

14

testified that he did not ask defendant any questions or make any statements prior to defendant making this statement.   Tr. 96-97.   Officer Johnson also did not ask any questions of defendant after he made the statement.   Tr. 98.   Subsequent to defendant making this statement, Officer Johnson told him that he could talk about the incident after the <u>Miranda</u> rights were read to him.   Tr. 99.

####    I.   December 30, 2005 Statement

Sergeant Kelly O'Rourke, with the Minneapolis Police Department, testified that he interviewed defendant on December 30, 2005.   Specifically, Sergeant O'Rourke stated that defendant contacted him and Sergeant O'Rourke's partner and asked them to come down to the jail to speak with him.   Tr. 284.   Sergeant O'Rourke believed that defendant had asked for him because he had been investigating the Blood Street Gang for a period of time.   Tr. 288.   Sergeant O'Rourke noted that defendant had been arrested on December 21, 2005 on a charge of possession of crack cocaine.   Tr. 284. Sergeant O'Rourke and his partner Officer Seidel met with defendant in an interview room.   Tr. 285.   Sergeant O'Rourke confirmed with defendant that defendant had contacted them and that he wanted to talk.   <u>Id.</u>  Defendant stated that he wished to talk to them.   <u>Id.</u>  Sergeant O'Rourke told him that they would have to read defendant his <u>Miranda</u> rights, as he was in custody.   <u>Id.</u>   Defendant was read his <u>Miranda</u> rights and he was asked if he understood all of his rights and if he still wanted to talk.   <u>Id.</u> Defendant stated that he understood his rights and wanted to talk.   <u>Id.</u>  The interview lasted approximately 30-50 minutes and the whole interview was recorded.   Tr. 285, 289.  Sergeant O'Rourke denied any assertion that he told defendant that he would be

released from custody if he cooperated with the officers. Tr. 289. Sergeant O'Rourke could not recall if defendant was released after the interview, if he arranged for defendant's release, or if he recommended to anyone that defendant be released after he had given his interview. Tr. 290, 293. Sergeant O'Rourke stated that he did not have authority to release defendant, as it would have been up to the prosecuting attorney. Tr. 292. Sergeant O'Rourke testified that he did not recall talking to a prosecuting attorney. Id.

Defendant never asked for an attorney nor did he at anytime tell the officers that he no longer wished to speak to them. Tr. 286. Sergeant O'Rourke testified that no promises or threats were made to defendant. Id. Defendant appeared to appropriately respond to questions and the conversation appeared to be free flowing and honest. Id. Defendant did state during his interview that he was willing to cooperate with the officers and to help out with regards to certain people, however, Sergeant O'Rourke denied telling defendant that he could be released if helped out. Tr. 293. The interview terminated when Sergeant O'Rourke asked defendant if he had anything else he wanted to add to the interview, and defendant said no. Tr. 286.

J.    **Identification by Photographic Array**

Officer Jeffery Seidel, with the Minneapolis Police Department and the Metro Gang Strike Force, testified that he put together a photographic array, which included a picture of defendant, to be shown to witnesses. Tr. 257. The photographic array included a collection of photographs, approximately 4x6 or 5x7 inches in size consisting of pictures of males with the same racial background who were approximately the same

16

age.  Tr. 258; Government Ex. 6.  The photographic array contained over 130 pictures of individuals matching this age and race profile.  Tr. 260.  Officer Seidel suspected that a number of the individuals listed in the photographic array were members of the Rolling 30's Bloods Gang.  Tr. 261   According to Officer Seidel, he showed the photographic array to four witnesses with a prior relationship to defendant pertaining to involvement with the Rolling 30's Bloods Gang.  Tr. 259-60.  The witness knew defendant from a time period ranging from ten years to all of their lives.  Tr. 259.   Officer Seidel presented the array to the witnesses by explaining to them that there may or may not be people in the array that they recognized and asked them to go through the array, picture by picture, and identify anyone they recognized and how or why they knew the individual.  Tr. 261.  The witnesses were not given any information regarding the identities of the people in the arrays.  Id.  Nor was there any discussion about defendant before viewing the photographic array.  Tr. 265.  None of the witnesses hesitated in identifying defendant and immediately started talking about defendant when they saw his picture.  Tr. 262, 265.

### K.   Search of Defendant's Property at MCF-Stillwater and MCF-Oak Park Heights

Investigator Erin Spruance, with the Intelligence Department of the Minnesota Department of Corrections, testified that on July 28, 2006 defendant was an inmate at Minnesota Correctional Facility-Stillwater ("MCF-Stillwater").  Tr. 210.  Investigator Spruance stated that she searched defendant's property tubs, which were used to safely store defendant's property while he was in segregation.  Tr. 211.  Investigator

Spruance maintained that inmates are not allowed to have most of their property with them while confined in segregation.  Id.  Defendant's property tub was held in the MCF-Stillwater Property Department.  Id.  During her search of defendant's tub, Investigator Spruance did not take any property, however, she made photocopies of items that pointed or directed her to defendant's involvement with the Rolling 30's Bloods Gang. Tr. 212.  This included monikers or gang references.  Id.  Investigator Spruance also testified that she searched defendant's property tub on August 17, 2007, while he was an inmate at Minnesota Correctional Facility-Oak Park Heights ("MCF-Oak Park Heights").   Tr. 212-13.   Investigator Spruance collected the originals of items in defendant's tub pertaining to a security threat group as contraband.  Tr. 214.

Investigator Spruance testified that she decided to search defendant's tubs because his name came up during her investigation of Rolling 30's Bloods gang.  Tr. 215.   She also stated that the searches conducted related to an ongoing criminal investigation pertaining to the present criminal prosecution of defendant.  Id.

## II.   DISCUSSION

Before this Court addresses the merits of each motion submitted by defendant, it feels compelled to address generally the substance of defendant's submissions in support of each motion.

Defendant has been charged in three different counts with crimes spanning approximately 17 years.   Before this Court are 13 different motions to suppress evidence, statements, or a witness identification, five different motions to dismiss, and one motion to strike surplusage.   Of the 13 motions to suppress, defendant only

provided legal and factual argument in support of six of these motions, leaving the Government and the Court to guess at the possible bases for more than half of his motions.  In its post-hearing response, the Government argued as a preliminary matter, that to the extent that defendant failed to provide the Court with any specific arguments as to why certain evidence or statements should be suppressed, the motions should be deemed withdrawn or abandoned.  <u>See</u> Government's Omnibus Response to Defendant's Pre-trial Motions [Docket No. 355] at p. 2.  This Court agrees.  At the end of the day, as the moving party, at a minimum it is defendant's burden to come forth with some evidence and argument to support his position that evidence, statements or a witness identification should be suppressed.  <u>See</u> <u>United States v. Starks</u>, 193 F.R.D. 624, 629 (D. Minn. 2000) (quoting <u>United States v. de la Fuente</u>, 548 F.2d 528, 533 (5th Cir.), <u>cert.</u> <u>denied</u> 431 U.S. 932 (1977) ("It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing.")).  As the Court in <u>Starks</u> observed, "even in those circumstances where the Government has the ultimate burden of persuasion, Defendant has the initial burden of making a prima facie showing of illegality."  193 F.R.D. at 629; <u>see</u> <u>also</u> <u>United States v. Diezel</u>, 608 F.2d 204, 207 (5th Cir. 1979) ("As this Court said in <u>United States v. Evans</u>, 572 F.2d 455, 486 (5th Cir. 1978), <u>cert.</u> <u>denied</u> 439 U.S. 870 (1978), 'The burden is on the movant to make specific factual allegations of illegality, to produce evidence, and to persuade the court that the evidence should be suppressed.'").  Here, as noted in the discussions with respect to each motion to suppress, <u>infra</u>, in seven motions, defendant offered neither facts nor legal argument to support his claims, suggesting to this Court

19

that either that he has waived or abandoned the motions or that they were frivolous. See Rodriguez v. Young, 708 F. Supp. 971, 982 (E.D. Wisc. 1989), aff'd, 906 F.2d 1153 (7th Cir. 1990), cert. denied, 498 U.S. 1035 (1991) (finding "a defense attorney has an obligation not to bring frivolous motions").  As the Seventh Circuit stated in affirming the district court's decision in Rodriguez:  "We most emphatically do not mean to suggest that in the name of effective assistance, criminal defense lawyers should move to suppress every statement by every witness the prosecution presents. Only evidence for which there are colorable grounds for exclusion should be targeted. Frivolous motions should not be brought."  Rodriguez v. Young, 906 F.2d 1153, 1161 n. 3 (7th Cir. 1990); see also United States. v. Crocker, 510 F.2d 1129, 1135 (10th Cir. 1975) (quoting Rogers v. Richmond, 365 U.S. 534, 546 (1961) ("It is fundamental that on a motion to suppress there must be 'a foundation in fact for the legal result.")).

Thus, as to those motions to suppress that defendant failed to produce evidence and argument to support the motion, this Court recommends denying those motions on that basis alone.  However, in an abundance of caution, but with no understanding of the basis for each such motion, this Court has gone ahead and addressed the merits of that motion.  Defendant's counsel is on notice that in the future, this Court will not countenance the filing and pursuit of motions without factual and legal support, and it will not hesitate to recommend denial of such motions on that basis alone.  That said, this Court now proceeds to address the merits of each one of defendant's motions.

A.     <u>Incident of August 13, 1994-Suppression of Gun</u>

Defendant argued that the gun located in Apartment 303 in Minneapolis should be suppressed as he had an expectancy of privacy in the apartment and on grounds that the police lacked any legal basis to enter the dwelling.  <u>See</u> Def.'s Mem. at p. 3. With regards to what Officer Abbas characterized as a protective sweep of the apartment due to defendant's statement about getting a gun, defendant also argued that the sweep was not warranted because: (1) there was no suggestion that defendant or anyone else actually threatened to use a gun; (2) any belief that there was a gun in the apartment was speculation, not supported by probable cause; (3) the officers were looking for people with guns rather than a gun in the apartment; (4) if the police really feared for their safety based on a statement about a gun, it would hardly increase their security in this instance to go into someone else's private residence where they were unwanted; (5) Officer Abbas testified that the comment about a gun by itself was insufficient to arrest or even detain defendant or anyone else; and (6) the officers' excuse for entering the apartment was a pretext for trying to find more incriminating evidence against the people inside.  <u>Id.</u> at pp. 4-5.

In opposition, the Government argued that defendant had failed to meet his burden to show that he had standing to challenge the search of Apartment 303, and in the alternative, exigent circumstances, involving a threat to officer safety, warranted the warrantless entry into the apartment.   <u>See</u> Government's Omnibus Response to Defendant's Pre-Trial Motions ("Govt. Mem.") at pp. 7-8.

This Court rejects defendant's arguments and concludes that the motion to suppress should be denied.  First, this Court finds that defendant has failed to meet his burden of proving that he has standing to challenge the search of Apartment 303.  "Fourth Amendment rights are personal and may not be asserted vicariously. . . ."  United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994) (citing Rakas v. Illinois, 439 U.S. 128, 138-44 (1978)).   A defendant who moves to suppress evidence "bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search."  United States v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995) (citing United States v. Kiser, 948 F.2d 418, 423 (8th Cir. 1991), cert. denied, 503 U.S. 983 (1992)); see also United States v. Salter, 358 F.3d 1080, 1084 n. 2 (8th Cir. 2004).  "To establish a legitimate expectation of privacy, the defendant must demonstrate (1) a subjective expectation of privacy; and (2) that the subjective expectation is one that society is prepared to recognize as objectively reasonable."  Muhammad, 58 F.3d at 355 (citing United States v. Stallings, 28 F.3d 58, 60 (8th Cir. 1994)).  In this case, there was no evidence presented by defendant that the lawful renter of Apartment 303 gave him consent or permission to be in the apartment so as to give rise to an objectively reasonable expectation of privacy.   The only evidence before this Court is Officer Abbas' testimony that defendant told him that the he was "in charge."  Tr. 124.  This is not enough for this Court to find that defendant had a reasonable expectation of privacy in Apartment 303.  On this basis alone, defendant's motion to suppress the gun found in Apartment 303 should be denied.

Second, even if this Court had found that defendant had standing to challenge the search of Apartment 303, it the search and seizure of the gun is valid based on exigent circumstances.   "It is a well-established constitutional principle that law enforcement officers may not enter a person's home without a warrant unless the entry is justified by exigent circumstances or the consent of the occupant."   United States v. Conner, 127 F.3d 663, 666 (8th Cir. 1997) (citing Steagald v. United States, 451 U.S. 204, 211 (1981); Payton v. New York, 445 U.S. 573, 586 (1980)).   "Exigent circumstances exist [ ] when law enforcement officials have a 'legitimate concern for the safety' of themselves or others."   United States v. Vance, 53 F.3d 220, 222 (8th Cir. 1995) (citing United States v. Antwine, 873 F.2d 1144, 1147 (8th Cir.1989)); United States v. Duchi, 906 F.2d 1278, 1282 (8th Cir. 1990) (finding "the warrant requirement is suspended when--in the press of circumstances beyond a police officer's control--lives are threatened, a suspect's escape looms, or evidence is about to be destroyed") (citation omitted).   Thus, "[w]hen there is a reasonable fear of harm, a warrantless entry may be justified."   Vance, 53 F.3d at 222 (string citation omitted).

The facts in this case support a finding that Officer Abbas and his partner had a legitimate concern for their safety and that of the public, and therefore, were presented with exigent circumstances sufficient to justify entry into the apartment.   Officer Abbas testified that he encountered a loud party emanating from Apartment 303.   Tr. 119. Officer Abbas also stated that a person who came out of Apartment 303 yelled "Oh, shit. It's 5-0.   Fuck!   It's 5-0," and then came back and got into a physical altercation with Officer Abbas' partner.   Tr. 120, 122.   Defendant then appeared at the doorway of

Apartment 303 and told the person next to him, "[g]o get the gun. We'll handle this," and the person disappeared behind defendant.   Tr. 123, 136.   Given the hostility the occupants of Apartment 303 presented to the officers, coupled with defendant's statement to another person to go get a gun, the officers had a legitimate concern that this individual was going to go get a gun, thereby threatening the officers' safety and that of the bystanders in the hallway of the apartment complex.

Defendant's assertion that the officers did not have a legitimate concern for their safety because neither defendant nor anyone else actually threatened to use a gun borders on the preposterous, as his statement when he opened the door to police, "[g]o get the gun. We'll handle this," amounted to an implicit threat that he wanted a gun to deal with the police.

This Court also finds defendant's argument that any belief that there was a gun in the apartment was speculation and not supported by probable cause, to be meritless. Probable cause is not required for entry based on exigent circumstances.  In any event, officers had cause to believe that there was a gun in the apartment based on defendant's statement and the immediate disappearance into the apartment of the person to whom defendant.

Defendant's argument that the exigent circumstances did not exist because officers were looking for people with guns rather than a gun in the apartment is also rejected.  The issue is whether there was a gun inside the apartment that could be used against the officers or the public, not whether the gun was located on a person inside

the apartment or whether it was on a piece of furniture inside the apartment that someone could grab.

Defendant's argument that entry into the apartment was not warranted on grounds that the police did not increase their safety by entering a dwelling where they were not wanted is similarly nonsensical.  Under defendant's rationale, officers should wait until the threat was made real to them and the public, as opposed to trying to neutralize the situation before it escalated, thereby eviscerating the exigent circumstances exception to the Fourth Amendment warrant requirement altogether.

Finally, this Court finds that defendant has failed to provide any evidence that the officer's entrance based on their concern for their safety to be pretext for trying to find more incriminating evidence against the people inside.  To the contrary, the facts support a finding that the officers had a legitimate concern for the safety of themselves and of the public.

For all of these reasons, this Court finds that defendant's motion to suppress the gun found in Apartment 303 on August 13, 1994 should be denied.

### B.   Incident of August 13, 1994—Suppression of Statement

Defendant has moved to suppress the statement he made during the incident of August 13, 1994 at the Apartment 303.  Tr. 146.  The only statement in the record pertaining to this incident was defendant's statement, "[g]o get the gun. We'll handle this."  Tr. 123; see also Motion for Suppression of Confessions or Statements [Docket No. 209].  Defendant has provided no argument as to why this statement should be suppressed, leaving this Court to guess as to the possible grounds for the motion.

The protections afforded by <u>Miranda</u> are triggered when an individual "is both in custody and being interrogated." <u>United States v. Hatten</u>, 68 F.3d 257, 261 (8th Cir. 1995) (citing <u>United States v. Lawrence</u>, 952 F.2d 1034, 1036 (8th Cir. 1992)).

In order to decide whether any of the statements made by defendant should be suppressed, this Court must first determine whether defendant was (1) in custody, and (2) being interrogated. <u>See</u> <u>United States v. Hatten</u>, 68 F.3d 257, 261 (8th Cir. 1995) (finding the protections afforded by <u>Miranda</u> are only triggered when an individual "is both in custody and being interrogated") (citation omitted). If he was subject to a custodial interrogation, then this Court must determine if defendant was given his <u>Miranda</u> rights, and whether he waived those rights.

### 1. Custody

Under <u>Miranda</u>, an individual must be advised of his or her right to be free from compulsory self-incrimination and the right to the assistance of an attorney any time the individual is taken into custody for questioning. <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966); <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990); <u>see</u> <u>also</u> <u>Hatten</u>, 68 F.3d at 261 (holding that "[t]he protections afforded by <u>Miranda</u> are only triggered when an individual 'is both in custody and being interrogated'"). "Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way." <u>Miranda</u>, 384 U.S. at 444. The determination of whether an individual is in custody at a particular time depends on "the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a 'reasonable person in the suspect's position would

have understood his situation' to be one of custody." <u>Griffin</u>, 922 F.2d at 1347 (quoting <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984)).   In this case, defendant made the statement regarding the gun as he opened the door to police.  Given that the statement was made during defendant's first contact with police and before he was arrested or even detained, this Court finds that defendant was not in custody for the purposes of <u>Miranda</u>.

### 2.   Interrogation

"Interrogation" means "questioning initiated by law enforcement officers." <u>Miranda</u>, 384 U.S. at 444.   The test for determining whether questioning is "interrogation" within the meaning of <u>Miranda</u>, is whether, under all of the circumstances involved in a given case, questions are reasonably likely to elicit an incriminating response from the suspect.  <u>See</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980). Officer Abbas testified that he had not spoken to defendant before defendant made the statement regarding the gun. Tr. 123, 136.  As such, this Court finds that defendant's spontaneous statement was not a product of a police interrogation for the purposes of requiring a <u>Miranda</u> warning.

Given defendant's spontaneous statement occurred when he first came into contact with the police, this Court finds that defendant's motion to suppress August 13, 1994 statement should be denied.

### C.   <u>Suppression of May 17, 1996 Statement Made at Intake Interview</u>

Defendant has asked that this Court suppress his incriminating assertion of gang affiliation during an intake interview upon his first entry into the St. Cloud correctional

facility because there was no evidence in the record that it was voluntary, and no Miranda warning was given to him prior to him making the statement.  See Defendant's Post-Hearing Memorandum in Support of Motions to Suppress Evidence ("Def.'s Mem.") at  p. 15.  In particular, defendant's "Intake Interview Sheet" indicated that he identified himself as a member of the Bloods Gang and that his nickname was "JOEDEBE".  See Government Ex. 1.

Under Miranda, an individual must be advised of his or her right to be free from compulsory self-incrimination and the right to the assistance of an attorney any time the individual is taken into custody for questioning.  See Miranda v. Arizona, 384 U.S. 436, 444 (1966); Griffin, 922 F.2d at 1347; see also Hatten, 68 F.3d at 261 (holding that "[t]he protections afforded by Miranda are only triggered when an individual 'is both in custody and being interrogated'").  However, questions pertaining to seeking information necessary to complete processing that are not designed to elicit incriminatory admissions are exempted from the Miranda requirement.  See Pennsylvania v. Muniz, 496 U.S. 582, 601-02 (1990).

According to Donald Rothstein, Assistant Director of the Office of Special Investigations, when a new inmate first comes into the St. Cloud Correctional Facility, he must complete an intake interview and that part of that inquiry includes whether he is affiliated with any gang, group or organization.  Tr. 182.  This question is asked in order to ensure inmate safety and to avoid getting large numbers of the same gang into the prison system.  Tr. 183.  The questions are not asked to gather information about a particular crime.  Id.  This Court concludes that the questioning of defendant regarding

gang affiliation during his entrance into the St. Cloud facility was part of the standard booking routine, and was not intended to elicit damaging statements. Therefore, defendant's statements were not product of an interrogation for Fifth Amendment purposes. See United States v. Washington, 462 F.3d 1124, 1133 (9th Cir. 2006) (question about a suspect's "gang moniker" did not require a Miranda warning).[1] Defendant's motion to suppress the intake form should be denied.

### D.    April 17, 1998 Incident—Suppression of Presence and Firearm

Defendant argued that any evidence of his presence during the April 17, 1998 incident should be suppressed. See Def.'s Mem. at p. 8. Defendant maintains that police would not have been able to obtain and his identity if not for his illegal detention. In addition, defendant seeks suppression of the firearm found in the vehicle.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  "It is well established that a roadside traffic stop is a 'seizure' within the meaning of the Fourth Amendment." United States v. Jones, 269 F.3d. 919, 924 (8th Cir. 2001).  However, "a traffic violation – however minor – creates probable cause to stop the driver of a vehicle." United States v. Linkous, 285 F.3d 716, 719 (8th

---

[1]     This Court also notes that a defendant's answers to questions from a law enforcement officer are admissible in the absence of Miranda warnings so long as the questions asked of the subject are "reasonably prompted by a concern for public safety." See New York v. Quarles, 467 U.S. 649, 656 (1984). This exception applies even after the defendant has been restrained. See United States v. Liddell, 517 F.3d 1007, 1009 (8th Cir. 2008). In this case, the inquiry into gang affiliation was prompted by a concern for the facility and inmate safety.

Cir. 2002) (citations omitted).  This is true even if a valid traffic stop is a pretext for another investigation.  Id. (citation omitted).

Here, Officer Bakken testified that he pulled over the vehicle in which defendant was a passenger because the vehicle failed to come to a stop at a stop sign and turned without a signal.  Tr. 67.  As such, the stop of the vehicle was constitutionally valid.  In addition, courts have held that a police officer does not violate the Fourth Amendment by inquiring into the identity of a vehicle's passenger during the course of a lawful traffic stop, even absent reasonable suspicion that the passenger has committed a crime. See United States v. Slater, 411 F.3d 1003, 1005-06 (8th Cir. 2005); see also Muehler v. Mena, 544 U.S. 93, 101 (2005) ("'[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification;. . .'") (quoting Florida v. Bostick, 501 U.S. 429, 434-35 (1991)).  As such, even if Officer Bakken did not have a sufficient reasonable suspicion to detain defendant, he had the authority to inquire into the identity of defendant based on the lawful traffic stop.

Further, this Court finds that Officer Bakken had reasonable suspicion that criminal activity was afoot so as to detain defendant while the officer continued his investigation.  If an officer's suspicions are further aroused in the course of a lawful stop, "the officer may expand the scope of the inquiry and detain the occupants of the automobile for further investigation." United States v. Poulack, 236 F.3d 932, 936 (8th Cir. 2001). The reviewing court must then look at the "totality of the circumstances, in light of the officer's experience" to determine whether the officer had reasonable

suspicion to expand the scope of the stop. Id. (quoting United States v. Carrate, 122 F.3d 666, 668 (8th Cir. 1997)).   Defendant has not contested, nor can he contest, the pat down search of the driver, which yielded what appeared to be marijuana and crack cocaine on the driver's person.   Tr. 63.   In addition, Officer Bakken testified that the area where the stop occurred was known for the street-level distribution of narcotics, including marijuana and cocaine, and that the area had experienced recent shootings.[2] Tr. 85.

Based on a totality of the circumstances, including the discovery of drugs on the driver in an area known for criminal activity including drug trafficking, Officer Bakken had a reasonable suspicion to expand the scope of his investigation beyond the traffic stop, to investigate possible narcotics violations, and to detain defendant, as a passenger, while doing so.

With regards to the firearm discovered by Officer Bakken during an inventory search of the vehicle, defendant argued that the weapon should be suppressed as the officer lacked justification for searching through the vehicle.   See Def.'s Mem. at p. 8. Defendant asserted that he had standing to challenge the search because the area searched was close to where he was a passenger.   Id.   However, the "United States Supreme Court has explicitly determined that a person has no reasonable expectation of privacy in an automobile belonging to another."   United States v. Green, 275 F.3d

---

[2]   This Court acknowledges that mere presence in high crime area is not enough to give rise to reasonable suspicion, however, presence in a high-crime areas along with other observations of a police officer may give rise to reasonable suspicion that criminal activity may be afoot.   See United States v. Bailey, 417 F.3d 873, 877 (8th Cir. 2005), cert. denied, 547 U.S. 1104 (2006)).

694, 699 (8th Cir. 2001) (citation omitted).   Defendant has not cited to, nor can this Court find, any authority to support his assertion that he has an expectation of privacy in an automobile merely because the areas around the passenger compartment of the vehicle, in which he was seated, was searched.   To the contrary, the Eighth Circuit and the United States Supreme Court have concluded that individuals do "'not have a legitimate expectation of privacy in the glove compartment or area under the seat in a car in which they were 'merely passengers.'" United States v. Barragan, 379 F.3d 524 (8th Cir. 2004) (quoting Rakas v. Illinois, 439 U.S. 128, 148-49 (1978)).

Officer Bakken testified that the occupants of the vehicle, including defendant, stated that the vehicle belonged to someone else.   Tr. 65.   As a mere passenger, therefore, defendant could not claim a legitimate privacy interest and he lacks standing to challenge the search of the vehicle.

For all these reasons, defendant's motion to suppress his presence and the firearm seized on April 17, 1998 should be denied.

**E.** **Incident of September 5, 1999—"Suppression of Involvement"**

Defendant seeks suppression of his involvement in a chase by Officer Dean that resulted in the seizure of a gun he abandoned because his involvement and the gun resulted from an illegal vehicle stop.   See Def.'s Mem. at p. 10.   In particular, defendant argued that Officer Dean only testified that defendant was driving erratically and failed to come up with any Minnesota statute that justified the stop on that basis.   Id.

Officer Dean testified that he observed defendant driving a vehicle erratically by squealing its tires as it was turning corners in manner that was in violation of traffic laws.

Tr. 222.  Defendant fled from Officer Dean, abandoned his vehicle and was eventually apprehended while he was fleeing on foot.  The Government argued that defendant's motion should be denied because no traffic stop ever occurred – to the contrary, given that defendant fled before the stop could be effectuated.  See Govt. Mem. at p. 17.

The United States Supreme Court has concluded that an individual can only be seized for the purposes of the Fourth Amendment through a show of authority if he submits to the authority, however, if the individual flees, he is seized only when he is stopped.  See California v. Hodari D., 499 U.S. 621, 626 (1991) (the term seizure "does not remotely apply . . . to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee.").  This Court agrees that Officer Dean never made the traffic stop due to defendant's flight.  However, to the extent that defendant is making an argument that his ultimate seizure was a fruit of an illegal traffic stop, this Court still must deny defendant's motion to suppress, as there was probable cause to make the stop.

Officer Dean testified that he observed defendant's vehicle driving erratically based on squealing of its tires as it was turning corners in manner that was in violation of traffic laws.  Tr. 222.  Officer Dean pulled up behind the vehicle and it proceeded to speed up and make several more erratic turns.  Tr. 224.  When Officer Dean got ready to pull the vehicle over, it sped up, changed lanes and started to drive even more erratically.  Id.  Officer Dean then turned on his emergency equipment.  Id.  Contrary to defendant's assertion, Officer Dean was able to specify what traffic law defendant was breaking due to his erratic driving.  In particular, Officer Dean testified that the conduct

of defendant violated Minnesota's prohibition against careless or reckless driving.   Tr.

241.

        Minnesota Statute § 169.13 provides in relevant part:

           Reckless or careless driving

           Subdivision 1. Reckless driving. (a) Any person who drives
           any vehicle in such a manner as to indicate either a willful or
           a wanton disregard for the safety of persons or property is
           guilty of reckless driving and such reckless driving is a
           misdemeanor.

           (b) A person shall not race any vehicle upon any street or
           highway of this state. Any person who willfully compares or
           contests relative speeds by operating one or more vehicles
           is guilty of racing, which constitutes reckless driving, whether
           or not the speed contested or compared is in excess of the
           maximum speed prescribed by law.

           Subd. 2. Careless driving. Any person who operates or halts
           any vehicle upon any street or highway carelessly or
           heedlessly in disregard of the rights of others, or in a manner
           that endangers or is likely to endanger any property or any
           person, including the driver or passengers of the vehicle, is
           guilty of a misdemeanor.

Minn. Stat. § 169.13.

        Probable cause to support a traffic stop exists when a reasonable officer,

confronted with the facts known to the officer at the time of the traffic stop, could have

believed that there was a fair probability that a violation of law had occurred.   See

United States v. Andrews, 454 F.3d 919, 921 (8th Cir. 2006) (citations omitted).   This

Court is required to give law enforcement officers "substantial latitude in interpreting and

drawing inferences from factual circumstances."   United States v. Washington, 109 F.3d

459, 465 (8th Cir. 1997) (citations omitted).      Considering the totality of the

circumstances that were known to Officer Dean at the traffic stop, the Court finds that Officer Dean had sufficient probable cause to initiate the traffic stop for reckless or careless driving on September 5, 1999.  As such, defendant's motion to suppress his involvement during the September 5, 1999 incident should be denied.

Defendant has also moved to suppress the statement given by him to Officer Simonson on September 5, 1999.   Defendant chose not cross-examine Officer Simonson at the hearing, provided no argument at the hearing as to why the statement should be suppressed and failed to address the issue in his post-hearing memorandum of law.  Unable to divine a reason why the statement should suppressed, this Court finds that defendant's statement on September 5, 1999 was properly obtained.

Miranda v. Arizona requires that an individual be advised of his right to be free from compulsory self-incrimination and the right to the assistance of an attorney anytime the individual is taken into custody for questioning.  Miranda, 384 U.S. at 444; see also Griffin, 922 F.2d at 1347.  In this case, defendant was read his Miranda rights prior to any substantive questioning.  Tr.  172-73.

The next question is whether defendant's waiver of his Miranda rights was valid. The validity of a Miranda waiver has "'two distinct dimensions'--whether the waiver is voluntary and whether it is knowing and intelligent."  United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (quoting Colorado v. Spring, 479 U.S. 564 (1987), quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).  Here, there were no threats or promises made to defendant, so as to render his statement involuntary.  Tr. 173.  Further, this Court finds that the waiver made by defendant was knowing and intelligent based on the

fact that defendant was able request that the interview be terminated when he no longer wanted to answer questions.  Tr. 174.

For all of these reasons, defendant's motion to suppress the September 5, 1999 statement should be denied.

### F. Incident of January 8, 2000—Seizure of Gun

Defendant has challenged the seizure of a gun from a vehicle on January 8, 2000, in which he was an occupant, on the basis that Officer Dean lacked justification to search through the vehicle.  See Def.'s Mem. at p. 11.  He asserts that he has standing to challenge a search because the gun was found close to where he was a passenger in the vehicle.  Id.  Officer Dean testified that the occupants of the vehicle told him that a girl owned the vehicle and that she had left before the police officer arrived.  Tr.  236. Given that defendant had no ownership interest in the vehicle, he lacks standing to challenge the search of the car.  See supra, Section II.D.  As such, defendant's motion to suppress the seizure of the gun found by Officer Dean on January 8, 2000 should be denied.

### G. June 4, 2000 Incident—Suppression of Identity and Gun

Defendant argued that his identity and the gun seized on June 4, 2000 should be suppressed because law enforcement officers, without probable cause or reasonable suspicion, unlawfully seized and arrested him and that the chase and abandonment of the firearm were all the products of the prior illegal conduct.  See Def.'s Mem. at p. 13.

This Court concludes that defendant's motion to suppress should be denied. First,  defendant's  conduct  evidenced  voluntary  abandonment  of  the  gun,  and

consequently, he has no legitimate interest in the property.   Second, at the time defendant discarded the firearm, he was not "seized," within the meaning of the Fourth Amendment, and thus, the subsequent confiscation of the abandoned gun by Officer Carlson and the identification of defendant that followed, was not illegal.   Third, even if this Court were to conclude that defendant had been seized, and that his subsequent the throwing away of the gun and his eventual identification was the fruit of that seizure, this Court concludes that defendant's initial seizure was valid.

"The warrantless seizure of abandoned property does not violate the Fourth Amendment."   United States v. Segars, 31 F.3d 655, 658 (8th Cir. 1994) (citing Abel v. United States, 362 U.S. 217, 241 (1960)).   This is because when an individual voluntarily abandons property, they relinquish any expectation to privacy they might have had in the property.   See Segars, 31 F.3d at 658 (quoting United States v. Jones, 707 F.2d 1169, 1172 (10th Cir.), cert. denied, 464 U.S. 859 (1983)).   In ascertaining whether property has been abandoned, this Court must look to the totality of circumstances available to law enforcement officers, including whether there was a verbal denial of ownership and physical relinquishment of the property.   See United States v. Liu, 180 F.3d 957, 960 (8th Cir. 1999) (citing United States v. Landry, 154 F.3d 897, 899 (8th Cir. 1998), cert. denied, 525 U.S. 1086 (1999) (8th Cir. 1999)); see also Segars, 31 F.3d at 658 ("An expectation of privacy is a question of intent, which 'may be inferred from words spoken, acts done and other objective facts.'") (citations omitted).

The evidence in this case establishes that during defendant's flight, Officer Carlson observed defendant stop, drop something and then continue to run.   Tr. 156.

Officer Carson returned to the spot where he saw defendant drop something and discovered the handgun.  Id.  This Court finds that defendant's initial action of discarding the handgun, coupled with his failure to attempt to retrieve it, demonstrated that he intentionally abandoned the handgun.  Further, the fact that he was under police pursuit, did not render his abandonment of the handgun involuntary.  See Segars, 31 F.3d at 658 ("'The existence of police pursuit or investigation at the time of abandonment does not of itself render the abandonment involuntary.'") (quoting Jones, 707 F.2d at 1172).  The voluntary abandonment of the handgun by defendant leads this Court to find that defendant has no legitimate right of privacy to object to its seizure.  Given that he was validly arrested for possession of the abandoned firearm, his identity should also not be suppressed.

To the extent that defendant is arguing the abandonment of the firearm, and his identification by police, was a product of the initial unlawful seizure of his person by law enforcement officers, this Court disagrees.  The abandonment of the gun did not occur when defendant was seized, nor was it the consequence of an earlier unlawful seizure.  As stated previously, if the individual flees, he is seized only when he is stopped.  Hodari D., 499 U.S. at 626 ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful.").  Here, there is no evidence in the record that police officers even touched defendant before his flight.

Finally, even if the seizure of the abandoned firearm was the fruit of the initial seizure of defendant by Officer Carson (although this Court cannot understand how a

seizure has occurred when law enforcement officers merely pull up next to a person on a public road)[3] this Court concludes that the initial approach by officers towards defendant was lawful because it was supported by a reasonable suspicion that defendant had or was engaging in criminal activity.   An investigatory stop is exempt from the Fourth Amendment's requirements that a seizure of a person be made pursuant to a warrant or predicated on probable cause.   See United States v. Ortiz-Monroy, 332 F.3d 525, 528 (8th Cir. 2003) (citing Terry v. Ohio, 392 U.S. 1, 21-22(1968)).   "A Terry investigatory stop allows an officer to briefly to detain a citizen if the officer has reasonable suspicion that 'criminal activity may be afoot.'" Ortiz-Monroy, 332 F.3d at 528 (quoting Terry, 392 U.S. at 30); see also United States v. Johnson, 326 F.3d 1018, 1022 (8th Cir. 2003) (citation omitted) ("[A] law enforcement officer may stop and briefly question an individual if the officer has a reasonable suspicion that the person has committed or is about to commit a crime.").   "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  Terry, 392 U.S. at 21; see also United States v. Poiter, 818 F.2d 679, 683 (8th Cir. 1987) (finding that to pass Fourth Amendment scrutiny, a Terry-type stop must be based on a reasonable articulable suspicion of criminal activity, rather than mere conjecture or hunches.  In deciding whether the requisite degree of suspicion exists, we view the agents' observations as a whole. . . .").  In assessing the reasonableness of the

---

[3]      "It is 'clearly' not a seizure, for example, for an officer to approach an individual in a public setting, identify himself as a police officer, and ask the individual to step aside and talk to detectives."  United States v. Vera, 457 F.3d 831, 834-35 (8th Cir. 2006) (citation omitted).

action, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"  Terry, 392 U.S at 21-22 (citations omitted).

Here, Officer Carson testified that he was patrolling an area known to be a street-side narcotics trafficking area, and where people would flag down cars to deal for narcotics.  Tr. 153.  Officer Carson testified that he observed defendant on the sidewalk at this location on June 4, 2000, and that he observed defendant flagging down a vehicle, which in Officer Carson's experience was consistent with the dealing of drugs at the street level.  Tr. 153-54.  Officer Carson stated that recalled defendant talking at the window of the vehicle and observed him reach into the vehicle through the window.  Tr. 159, 164, 166.  At this point, based on Officer Carson's observations of possible illicit drug activities and possible possession of contraband on defendant's person, Officer Carson had specific and articulable facts, taken together with rational inferences, to stop defendant.  See United States v. Yang, 345 F.3d 650, 655 (8th Cir. 2003) (finding the even if a defendant's "actions might be innocently explained, his behavior 'must be considered as a whole and in the light of the officers' 'experience and specialized training.'") (emphasis added) (quoting United States v. Ameling, 328 F.3d 443, 448 (8th Cir. 2003), quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)); Poiter, 818 F.2d at 683 (finding that agents' "observations must be viewed through the eyes of persons who, like the agents in this case, are trained to cull significance from behavior that

would appear innocent to the untrained observer.") (citing United States v. Wallraff, 705 F.2d 980, 988 (8th Cir. 1983)).

Based on the totality of the circumstances, this Court finds that Officer Carson had a reasonable suspicion to initially stop defendant.  See United States v. Walker, 324 F.3d 1032, 1036 (8th Cir. 2003) ("'The determination of whether a government agent's suspicion is constitutionally reasonable is exceedingly fact specific. We examine the totality of the circumstances arguably supporting a determination of reasonable suspicion, evaluating those circumstances as they would be 'understood by those versed in the field of law enforcement.'") (quoting United States v. Demoss, 279 F.3d 632, 636 (8th Cir. 2002) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)). For all of these reasons, the Court concludes that defendant's motion to suppress his identity and the gun pertaining to the June 4, 2000 incident should be denied.

### H.     June 5, 2000 Incident—Suppression of Statement

Defendant has moved to suppress the statement given by him to Investigator Pecore on June 5, 2000.  Defendant provided no argument at the hearing as to why the statement should be suppressed and failed to address the issue in his post-hearing memorandum of law.  To the extent that defendant is arguing that the statement should be suppressed as the fruit of his unlawful arrest for possession of a firearm, his motion should be denied, as this Court has concluded that his arrest and the seizure of the firearm were proper for Fourth Amendment purposes.  See supra, section II.G.

Following his arrest, Investigator Pecore gave defendant his <u>Miranda</u> rights prior to any substantive interview.[4]  Defendant then made a voluntary and knowing waiver of his <u>Miranda</u> rights when he agreed to speak with Investigator Pecore.  Defendant's motion to suppress his June 5, 2005 statement should be denied.

**I.**    **October 15, 2005 Incident—Suppression of Crack Cocaine Found on Defendant's Person and Suppression of October 17, 2005 Statement**

Defendant argued at the hearing that the suppression of the crack cocaine found on his person during his booking into Hennepin County Jail is appropriate on the grounds that Officer Peterson lacked probable cause to arrest him in the first place.  Tr. 109.  Defendant offered no argument at the hearing or in his post-hearing memorandum as to why Officer Peterson lacked probable cause to arrest him.

Officer Peterson testified that he arrested defendant based on the outstanding warrants for his arrest and for the assault arising out of the citizen's arrest.  Tr. 106.  Law enforcement officers have probable cause to arrest individuals on outstanding warrants on unrelated crimes and to conduct a search incident to arrest.  <u>See</u> <u>United States v. Thomas</u>, 524 F.3d 855, 859 (8th Cir. 2008).  Officer Peterson had probable cause to arrest defendant at the scene of the fight, based on unrelated arrest warrants, even if there was a lack of probable cause for the assault arrest, and to search him at the police station incident to his arrest.  Therefore, defendant's motion to suppress the crack cocaine found on his person should be denied.

---

[4]    This Court notes that the entire contact between Investigator Pecore and defendant was tape-recorded.  Tr. 282.

Defendant has also moved to suppress the statement he gave to Officer Kasel on October 17, 2005, but again defendant provided no oral or written support for this motion.   To the extent that defendant is arguing that the statement should be suppressed as the fruit of his unlawful arrest, his motion should be denied, as the seizure of the crack cocaine from his person was proper for Fourth Amendment purposes.

Further, the undisputed record established that prior to questioning defendant, Officer Kasel read defendant his <u>Miranda</u> rights and defendant then agreed to speak with Officer Kasel.  Tr. 168.  At no time did defendant ask for an attorney, to remain silent or to discontinue the interview.  Tr. 169.  No threats or promises were made to defendant.  Tr. 169-71.  The interview was ended by Officer Kasel asking defendant if he gave his statement of his own free will, to which he said "yes".  Tr. 169.  Based on these facts, this Court concludes that defendant's wavier of his <u>Miranda</u> rights was voluntary and intelligent and therefore, his motion to suppress the October 17, 2005 statement should be denied.

## J.    <u>Suppression of December 21, 2005 Statement</u>

Defendant has moved to suppress the statement he gave to Officer Johnson on December 21, 2005.  Defendant provided no argument at the hearing as to why the statement should be suppressed and failed to address the issue in his post-hearing memorandum of law.[5]

---

[5]    In light of the testimony of Officer Johnson, the Court asked defendant's attorney if he was withdrawing the motion.  On the one hand, defense counsel stated he was not pursuing the motion; on the other hand, he stated he was not withdrawing the motion.

Officer Johnson, testified that defendant made the spontaneous statement, "are you going to take me down for just two pills?"  Tr. 97.  Defendant's statement was made during defendant's transport to jail relating to his arrest for possession of crack cocaine and without any prompting by Officer Johnson.[6]

As stated previously, the protections afforded by Miranda are triggered when a defendant is in custody and subject to an interrogation.  See Hatten, 68 F.3d at 261.  There is no dispute that defendant was in police custody at the time of his statement given his arrest.  The question in this case is whether the statement was a product of police interrogation.  "Interrogation is not limited to express questioning; it includes words or conduct that the officer should know are 'reasonably likely to illicit an incriminating response from the suspect.'"  United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).  However, "Miranda does not bar the government from introducing into evidence spontaneous statements made during a conversation not initiated by the officer."  Id. (quoting United States v. Hawkins, 102 F.3d 973, 975 (8th Cir. 1996), cert. denied, 520 U.S. 1179 (1997)).  Here, the statement made by defendant was made without any prompting by Officer Johnson.  Given that the December 21, 2005 statement was not a product of an

---

Tr. 101-102.  This is exactly the type of conduct that supports this Court's finding that the motion is frivolous.

[6]     This Court notes that defendant's counsel represented at the hearing that defendant was not challenging the search and seizure relating to the crack cocaine or his subsequent arrest for possession.  Tr. 59.  As such, defendant's motion to suppress the December 21, 2005 search and seizure pertaining to the crack cocaine is denied as moot.

interrogation, a <u>Miranda</u> warning was not required prior to the statement and therefore, defendant's motion to suppress the statement should be denied.

### K.     Suppression of the Identification by Photographic Array

Defendant moves to suppress the eyewitness identifications made by the four witnesses after seeing a photographic array shown to them by Officer Seidel.   Yet again, defendant failed to offer any factual or legal support at the hearing or in his post-hearing memorandum as to why the identifications should be suppressed.

The Fifth Amendment Due Process Clause prohibits identification testimony that derives from impermissibly suggestive procedures that may lead to an irreparably mistaken identification. <u>See Neil v. Biggers</u>, 409 U.S. 188, 198 (1972) ("It is the likelihood of misidentification which violates a defendant's right to due process."). However, "suggestive procedures, without more, do not require a holding that the due process clause has been violated." <u>United States v. Hadley</u>, 671 F.2d 1112, 1115 (8th Cir. 1982) (citing <u>Mason v. Brathwaite</u>, 432 U.S. 98, 114 (1977); <u>Biggers</u>, 409 U.S. at 198; <u>Harris v. Wyrick</u>, 644 F.2d 710, 712 (8th Cir. 1981); <u>United State v. Anderson</u>, 618 F.2d 487, 491 (8th Cir. 1980)).   The court must balance the corrupting effect of a suggestive procedure against the reliability of the identification to determine if testimony about the out-of-court identification and any subsequent identification violates the defendant's due process rights.  <u>See Hadley</u>, 671 F.2d at 1115; <u>see also Manson</u> , 432 U.S. at 114.

A due process challenge to identification testimony is examined in two steps. First, the court must determine whether the identification procedure used by police was

"impermissibly suggestive." United States v. Donelson, 450 F.3d 768, 772 (8th Cir. 2006) (citations omitted); see also Graham v. Solem, 728 F.2d 1533, 1541 (8th Cir. 1984) (citation omitted).  If so, then the court must "examine the totality of the circumstances to determine whether 'the suggestive procedures created a very substantial likelihood of irreparable misidentification.'"  Donelson, 450 F.3d at 772 (quoting United States v. Williams, 340 F.3d 563, 567 (8th Cir. 2003)).  "Pared to its essence, the second inquiry is whether the identification is reliable." Graham, 728 F.2d at 1541 (citations omitted).  Thus, testimony regarding an out-of-court identification involving unnecessarily suggestive procedures will not be excluded if the totality of the circumstances indicates that the identification was still reliable enough to prevent misidentification. Hadley, 671 F.2d at 1115.

The photographic array shown by Officer Siedel contained over 130 pictures of males with the same racial background and approximately the same age.  Tr. 258, 260. Officer Seidel presented the array to four witnesses by explaining to them that there may or may not be people in the array that they recognized and asked them to go through the array picture by picture and identify anyone they recognized e and how or why they knew the individual.  Tr. 261.  The witnesses were not given any information regarding the identities of the people in the array.  Id.  Nor did the Officer Siedel discuss the defendant with the witnesses before they viewed the photographic array.  Tr. 265. None of the four witnesses hesitated in identifying defendant and immediately started talking about him when they saw his picture.  Tr. 262, 265.

The Court has reviewed the photographic array and finds noting suggestive about it so as to allow the witnesses to identify defendant.  <u>See</u> Government Ex. 6. Further, the procedure set forth by Officer Siedel is not suggestive as he only told the witness to let him know if they recognized any of the individuals in the photographs. Indeed, the evidence in the record was that defendant was not mentioned prior to the witness identifications.  Lacking any evidence or argument to support any suggestion that the identification procedure used by police was "impermissibly suggestive," defendant's motion to suppress the identifications should be denied.

**L.**   **Searches of Defendant's Property at MCF-Stillwater and MCF-Oak Park Heights**

Defendant seeks suppression of evidence seized by Investigator Spruance from his property tubs while he was an inmate at MCF-Stillwater and MCF-Oak Park Heights. Defendant argued that the searches required a warrant, as the searches were done as part of an ongoing criminal investigation of the instant case.  <u>See</u> Def.'s Mem. at pp. 17-19.

The protections afforded by the Fourth Amendment do not apply to searches or, and seizures from, prison cells, as prisoners lack a reasonable expectation of privacy. <u>See</u> <u>Hudson v. Palmer</u>, 468 U.S. 517, 526 (1984).  In <u>Hudson</u>, the Suprese Court rejected convicted inmates action against a prison official under 42 U.S.C. § 1983 claiming that an unreasonable "shake down" search of his prison locker and cell violated his Fourth Amendment rights.  <u>Id.</u> at 529.  Defendant argued that <u>Hudson</u> was not applicable to this case because the Supreme Court's rationale was based entirely on

the recognition of a prison's need to maintain security.  <u>See</u> Def.'s Mem. at p. 18.  Here,

Investigator Spruance testified that the searches of defendant's property tubs related to

on going criminal investigation pertaining to the Rolling 30's Blood Gang and the

present criminal prosecution of defendant.  Tr. 215.

This Court rejects the proposition that a warrantless search of an inmate's space

may only be conducted if the search is done to maintain the security of a facility.  The

Supreme Court in <u>Hudson</u> made no distinctions between searches done for facility

safety or for other purposes when it held:

> [S]ociety is not prepared to recognize as legitimate <u>any</u> subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment prescription against unreasonable searches does not apply within the confines of the prison cell.

<u>Hudson</u>, 468 U.S. at 525-26 (emphasis added).

Furthermore, the Supreme Court also found prison security was not the only

institutional interest of a prison:

> The curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of institutional needs and objectives of prison facilities, chief among which is internal security. Of course, these restrictions or retractions also serve, incidentally, as reminders that, under our system of justice, <u>deterrence and retribution</u> are factors in addition to correction.

<u>Id.</u> at 524 (emphasis added) (internal citations omitted).  The Supreme Court went on to

find that the "recognition of privacy rights for prisoners in their individual cells simply

cannot be reconciled with the concept of incarceration and the needs and objectives of

penal institutions."  <u>Id.</u> at 526.  Thus, warrantless searches of a prisoner's cell or other

storage unit is not only appropriate based on the needs of the institution but on the fact that prison is meant to be a deterrent and meant to punish a individual for his crimes. See Willis v. Artuz, 301 F.3d 65, 69 (2d Cir. 2002) ("One of the incidents of confinement for a convict is the loss of privacy, which serves the legitimate purpose of retribution as well as the institutional security needs of the prison system."); see generally, Shorter v. Lawson, 403 F. Supp.2d 703, 707 (N.D. Ind. 2005) ("The Fourth Amendment does not apply to prison or jail cells, regardless of the reason, or lack of reason, for the search.") (citing Hudson, 468 U.S. at 526).

Defendant's reliance on a Second Circuit case, United States v. Cohen, 796 F.2d 20 (2d Cir. 1986), for the proposition that a warrant is required when a search is conducted for the purposes of bringing a criminal case, is unwarranted.   See Def.'s Mem. at p. 19.   In Cohen, the individual was not a convicted prisoner, like defendant, but was rather a pre-trial detainee who had challenged the warrantless search and seizure in his cell.   In Bell v. Wolfish, 441 U.S. 520 (1979), the Supreme Court assumed for purposes of its decision that a pretrial detainee retained a reasonable expectation of privacy in his cell, which is protected by the Fourth Amendment.   Id. at 556-57. Moreover, the Second Circuit refused to extend the holding in Cohen to searches pertaining to inmates who have already been convicted of a crime.   See Willis, 301 F.3d at 69.   In Willis, the Second Circuit concluded that the warrantless search of prison cell, conducted at the behest of police seeking evidence of uncharged crime, did not violate prisoner's right to be free of unreasonable searches, even though the search did not

serve any purpose related to prison security, where prisoner was a convict and not a pre-trial detainee. Id. at 68-69.

Given that defendant had already been convicted of a crime, he had no legitimate expectation of privacy in his property tubs for Fourth Amendment purposes. As such, his motion to suppress the search and seizure from the tubs should be denied.

### M.   Suppression of Additional Statements

While defendant has moved to suppress statements made by him on September 2, 1990, December 22, 1990, October 18, 1993, and April 17, 1998, the Government represented that it will not be offering these statements at trial. Tr. 12, 41. Therefore, defendant's motion to suppress these statements should be denied as moot.

### N.   Motion to Dismiss Indictment as Untimely

Defendant asserts that Counts 1 and 2 of the Indictment are barred by the general five-year statute of limitations, or alternatively, should be dismissed because they were improperly delayed in violation of the Due Process Clause of the Fifth Amendment and the Sixth Amendment's speedy trial guarantee. See Motion to Dismiss Counts 1, 2, and 9 [Docket No. 215]; see also Defendant's Supplemental Motion to Dismiss Counts 1, 2 and 9 [Docket No. 318] at p. 2.

#### 1.   Statute of Limitations

Count 1 of the Indictment alleges that defendant and others engaged in a conspiracy to distribute and posses with intent for distribution of narcotics during a period starting in 1990 through August of 2007.  Count 2 of the Indictment alleges that defendant and others engaged in a conspiracy to possess firearms during and in

relation to a drug trafficking crime during a period starting in 1990 through August of 2007.  "Federal drug conspiracy crimes are subject to the five-year statute of limitations found in 18 U.S.C. § 3282."  United States v. Grimmett, 236 F.3d 452, 453 (8th Cir. 2001).  "When a defendant is charged with conspiracy, as here, the limitations period commences 'from the occurrence of the last overt act committed in furtherance of the conspiracy.'"  United States v. Perry, 152 F.3d 900, 904 (8th Cir. 1998) (quoting United States v. Dolan, 120 F.3d 856, 864 (8th Cir. 1997)).  In this case, the Indictment alleges that the conspiracies continued through August of 2007.  As such, the five year statute of limitations for the conspiracy counts started to run in August of 2007, and the August 22, 2007 Indictment is timely.

        2.     Fifth Amendment

The Fifth Amendment to the United States Constitution prohibits the deprivation of "life, liberty, or property without due process of law."  U.S. Const., Amend V.  In order for pre-indictment delay to constitute a Due Process violation, a defendant must first show "the delay actually and substantially prejudiced the defendant . . ., then the court balances the reasons for the delay against the prejudice shown."  United States v. Benshop, 138 F.3d 1229, 1232 (8th Cir 1998) (citation omitted).  Thus, the defendant must establish prejudice before the court will inquire into any reasons for the delay.  See id.; see also United States v. Sturdy, 207 F.3d 448, 452 (8th Cir. 2000).  Speculative or conclusory claims of possible prejudice fail to meet the required showing of prejudice. See Sturdy, 207 F.3d at 452.

In his initial motion, defendant only asserted that "as a result of the government's unjustified delay, exculpatory witnesses have disappeared or cannot be identified, evidence has been destroyed, and records which might lead to exculpatory evidence has been lost or otherwise misplaced."   Motion to Dismiss Counts 1, 2, and 9 [Docket No. 215].   Defendant reiterated his due process claim in his Supplemental Motion to Dismiss Counts 1, 2 and 9 [Docket No. 318], asserting that waiting 17 years to be charged with Counts 1 and 2 and two years to be charged with Count 9 of the Indictment "greatly prejudiced" his defense.   A showing of actual prejudice requires that the defendant specify witnesses or evidence lost during a delay are properly attributable to the government.   See Sturdy, 207 F.3d at 452 (quoting United States v. Bartlett, 794 F.2d 1285, 1290 (8th Cir. 1986)).   Defendant did not specify in his moving papers the identity of any witnesses that have disappeared or any evidence that has been lost, let alone present evidence to attribute the theoretical losses of such evidence to the actions of the Government.

Only in his Reply Memorandum to the Government's response to defendant's motion for a bill of particulars and the motion to dismiss on multiplicity grounds, did defendant assert that he was unable to obtain the transcripts from the hearing and trial at the state court level stemming from his June 4, 2000 arrest based on being a felon in possession of a firearm.   See Defendant's Reply Memorandum in Support of Bill of Particulars and Motions to Dismiss and to Strike Surplusage ("Reply Mem.") at p. 8. Defendant claims that the prejudice to him is that he was unable to use the transcripts to cross-examine Officer Carlson at the pre-trial motions hearing and he will not be able

use these transcripts to cross-examine witnesses at trial. Id. Even if the loss of these transcripts amounts to an actual prejudice for defendant, he must still first establish that the prosecution intentionally delayed the Indictment either "to gain a tactical advantage or to harass him." United States v. Gladney, 474 F.3d 1027, 1030 (8th Cir. 2007) (citing United States v. Haskell, 468 F.3d 1064, 1070 (8th Cir. 2006)); see also Sturdy, 207 F.3d at 452 ("Sturdy must establish that . . . the government intentionally delayed his indictment either to gain a tactical advantage or to harass him."). Defendant has not argued or presented evidence to establish that the prosecution intentionally delayed the Indictment either to gain a tactical advantage or to harass him. In any event, a prosecutor has wide latitude to decide when to seek an Indictment in a case like this that involves an ongoing conspiracy spanning many years, involving numerous individuals. As such, defendant's Motion to Dismiss the Indictment on Fifth Amendment grounds should be denied.

3.   Sixth Amendment Right to a Speedy Trial

Defendant argued that failure to seek indictment long after many his state arrests and going back to 1990 violated his Sixth Amendment right to a speedy trial. See Motion to Dismiss Counts 1, 2, and 9 [Docket No. 215].

Defendant's Sixth Amendment right to a speedy trial in this Court was triggered when he was arrested under the federal charges in October 2007, not at the time of any underlying state arrests. See United States v. Garner, 32 F.3d 1305, 1309 (8th Cir. 1994) (finding that a state arrest does not affect the Sixth Amendment speedy trial analysis on a federal charge even if the state arrest is for conduct that is the basis of a

subsequent indictment for a federal offense).   Therefore, defendant's Motion to Dismiss the Indictment on Sixth Amendment grounds should be denied.

### O.      Motion to Dismiss for a Violation of the *Petite* Policy

Defendant argued that Count 9 of the Indictment should be dismissed because it alleges conduct for which he has already been accused of and convicted in state court, a violation of the *Petite* Policy.   The *Petite* policy is an internal policy of the Department of Justice which provides "that a federal prosecution should not be based on substantially the same acts as were the basis for a prior state prosecution unless there is a compelling federal interest."   United States v. Larsen, 427 F.3d 1091, 1094 (8th Cir. 2005).   However, the policy "confers no substantive rights on a criminal defendant, and thus [defendant] could obtain no relief based on it even if the government had acted contrary to it here."   Id. (citing United States v. Leathers, 354 F.3d 955, 962 & 962 n. 5 (8th Cir. 2004), cert. denied, 125 S.Ct. 285 (2004)).   Therefore, even if the prosecution violated the *Petite* policy by charging defendant with conduct for which he has already been accused of and convicted in state court, the policy does not provide defendant with any basis to dismiss Count 9 of the Indictment and his motion should be denied.

### P.      Motion to Dismiss Indictment as Multiplicitous

Defendant moved to dismiss Counts 1 and 2 of the Indictment as multiplicitous. See Supplemental Motion to Dismiss Counts 1, 2 and 9 [Docket No. 318].   However, defendant asserted that Counts 1 and 2 are multiplicitous not of each other but internally, as each of the counts alleges a conspiracy that took place over a 17-year period without any explanation of the conspiracy.   See Reply Mem. at p. 7.

Count 1 of the Indictment alleges that defendant and others engaged in a conspiracy to distribute and posses with intent for distribution, narcotics during a period starting in 1990 through August of 2007.   Count 2 of the Indictment alleges that defendant and others engaged in a conspiracy to possess firearms during and in relation to a drug trafficking crime during a period of time starting in 1990 through August of 2007.

"A multiplicitous indictment is one that charges a single offense in multiple counts." United States v. Webber, 255 F.3d 523, 527 (8th Cir. 2001).  "Multiplicity also becomes an issue when a single act is the basis for charging two or more separate offenses, each for the violation of a separate statutory provision."  United States v. Christner, 66 F.3d 922, 927 (8th Cir. 1995).  The Eighth Circuit relies on the two-part test it devised in United States v. Bennett, 44 F.3d 1364 (8th Cir. 1995), which cited Garrett v. United States, 471 U.S. 773 (1985):

> First, a court must ask whether Congress "intended that each violation be a separate offense." ··· If it did not, there is no statutory basis for the two prosecutions, and the double jeopardy inquiry is at an end···· Second, if Congress intended separate prosecutions, a court must then determine whether the relevant offenses constitute the "same offense" within the meaning of the Double Jeopardy Clause.

Christner, 66 F.3d at 928, citing Bennett, 44 F.3d at 1373 (citations omitted).

As to the first part of the test, this Court finds that Congress intended that distribution of narcotics and possession of a firearm during the distribution of narcotics be treated as separate offenses.  Under Count 1 of the Indictment, defendant was charged with a violation of 21 U.S.C. § 841(a)(1), which provides:

> Except as authorized by this subchapter, it shall be unlawful
> for any person knowingly or intentionally—
>
> (1) to manufacture, distribute, or dispense, or possess with
> intent to manufacture, distribute, or dispense, a controlled
> substance; or

21 U.S.C. § 841(a)(1).   Section 841(b)(1) sets forth the imprisonment penalties for

distributing various narcotics.  See 21 U.S.C. § 841(b)(1).

Under Count 2 of the Indictment, defendant was charged with a violation of 18

U.S.C. § 924, which provides

> any person who, during and in relation to any crime of
> violence or drug trafficking crime (including a crime of
> violence or drug trafficking crime that provides for an
> enhanced punishment if committed by the use of a deadly or
> dangerous weapon or device) for which the person may be
> prosecuted in a court of the United States, uses or carries a
> firearm, or who, in furtherance of any such crime, possesses
> a firearm, shall, in addition to the punishment provided for
> such crime of violence or drug trafficking crime—
>
> (i) be sentenced to a term of imprisonment of not less than 5
> years;

18 U.S.C. § 924(c)(1)(A).   Section 924(o), which is referenced in the Indictment, allows

a sentence of up to twenty years if the firearm involves a machine gun.   Given that

Congress decided to set forth a separate punishment for being in possession of a

firearm during drug trafficking under § 924, apart from the punishment set forth related

to § 841(b) for the distribution of narcotics, this Court finds that they are separate

offenses for purposes of multiplicity.

Turning to the second part of the two-part test articulated in Christner, the Court

must determine whether the offenses constitute the "same offense."   In order to

establish whether offenses constitute the same offense, the test is whether each provision requires proof of a fact that the other does not.   66 F.3d at 928 (citing Blockburger v. United States, 284 U.S. 299, 304 (1932)).   While 21 U.S.C. § 841 involves the distribution of narcotics, 18 U.S.C. § 924 involves the trafficking of narcotics and the possession a firearm during the distribution.   The added element of the possession of a firearm requires a proof of a fact that the drug distribution offense does not.

For all these reasons, this Court concludes that Counts 1 and 2 of the Indictment are not multiplicitous and defendant's motion to dismiss on this basis should be denied.

**Q.   Motion to Dismiss for Lack of Probable Cause in the Indictment**

Defendant asks this Court to dismiss the Indictment as to Counts 1, 2 and 9 on the grounds that the Indictment fails to establish probable cause of his involvement in the indicted offenses.   See Supplemental Motion to Dismiss Counts 1, 2 and 9 [Docket No. 318] at pp. 1-2.   In particular, defendant argued that Counts 1 and 2 allege conspiracies over a long period of time without any explanation of the agreements or actions that constituted the criminal conspiracies.   In addition, defendant argued that while Count 9 charged him with possession with intent to distribute crack cocaine base, the charge is based on an underlying incident where defendant was arrested with a gram of the controlled substance for which there was no evidence that he intended to distribute.   Id. at p. 2.

Defendant's arguments go sufficiency of the evidence before the grand jury. However, "[i]t has long been settled that an indictment is not open to challenge on the

ground that there was inadequate or insufficient evidence before the grand jury." United States v. Nelson, 165 F.3d 1180, 1182 (8th Cir. 1999) (citing Costello v. United States, 350 U.S. 359, 363-64 (1956); United States v. Cady, 567 F.2d 771, 776 (8th Cir. 1977)). As such, defendant's motion to dismiss based on lack of probable cause due to insufficient evidence should be denied.

### R.   Motion to Dismiss on Double Jeopardy Grounds

Defendant moves the Court for dismissal of Count 9 of the Indictment on the grounds that he was already prosecuted in state court for crimes arising out of the same set of evidence, for which he served time in prison.   See Supplemental Motion to Dismiss Counts 1, 2 and 9 [Docket No. 318] at p. 2.  In particular, defendant argues that the Double Jeopardy Clause of the Fifth Amendment bars his subsequent prosecution for these same crimes in federal court.

As general rule, double jeopardy does not bar federal prosecution of conduct which has been previously been charged and tried in state court, under the concept of dual sovereignty.  State v. Rinaldi, 434 U.S. 22, 28 (1977) (citing Bartkus v. Illinois, 359 U.S. 121 (1959); Abbate v. United States, 359 U.S. 187 (1959)).  Indeed, "[i]t has long been the law under the doctrine known as dual sovereignty that federal prosecution following state prosecution 'of the same person for the same acts" does not violate the defendant's criminal rights.'"   United States v. Basile, 109 F.3d 1304, 1306-07 (8th Cir. 1997) (quoting Abbate, 359 U.S. at 194).  The only exception to the dual sovereignty doctrine is where "'the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution.'"   Id. at 1307

58

(quoting <u>Bartkus</u>, 359 U.S. at 124).  Defendant has made no such assertion in this case and instead has merely argued that the Government is improperly prosecuting him again for the same crime he has already addressed in state court.  As such, defendant's motion to dismiss based on double jeopardy grounds as to Count 9 should be denied.

Defendant also asserted that there may be a double jeopardy issue as to the conspiracy claims in Counts 1 and 2, however, he cannot know for sure as he needs a bill of particulars to determine if any state prosecutions are encompassed by the conspiracy counts.  <u>See</u> Supplemental Motion to Dismiss Counts 1, 2 and 9 at p. 3. However, even if the Government intends to use events that were the subject of state prosecutions to support the conspiracy counts in the federal Indictment in this case, double jeopardy would not bar the prosecution of Counts 1 and 2.  <u>See</u> <u>United States v. Larsen</u>, 427 F.3d 1091,1094 (8th Cir. 2005) ("The facts related to the motorcycle trade, which formed the basis for Mr. Larsen's Minnesota conviction, were subsequently tied to a conspiracy involving drug activity in South Dakota, providing ample reason for federal authorities to step in. The federal government may conduct such subsequent prosecutions because it is a different sovereign from the state.") (citations omitted). Defendant's suggestion that Counts 1 and 2 be denied on double jeopardy grounds should be denied.

### S.    Motion to Strike Surplusage—References to Gang Membership

Defendant has requested that this Court strike as surplusage from the Indictment all references to street gangs generally, or the "Bloods" on the grounds that such allegations are legally irrelevant to the proof of any charged offense and are unfairly

prejudicial under Federal Rules of Evidence.  <u>See</u> Motion to Strike Surplusage [Docket No. 216].

Count 1 of the Indictment states that the defendants listed under the Count 1:

> <u>as members and associates of the Rolling 30's Bloods (RTBs) criminal street gang</u>, knowingly and intentionally conspired with each other and with other persons, to possess with the intent to distribute and distribute fifty (50) grams or more of cocaine base (crack), a controlled substance. . . .

(emphasis added).

Similarly, Count 2 of the Indictment states that the defendants listed under the Count 2:

> <u>as members and associates of the Rolling 30's Bloods (RTBs) criminal street gang</u>, knowingly and intentionally conspired with each other and with other persons, whose names are known and unknown to the grand jury, to possess in furtherance of, carry and use a firearm during and in relation to a drug trafficking crime which may be prosecuted in a court of the United States; namely, intent to distribute and distribute cocaine base (crack). . . .

(emphasis added).

There is no other mention in the Indictment pertaining to defendant, including in Count 9, of a gang or the "Bloods".

A motion to strike surplusage from an Indictment is a matter within the Court's discretion.  <u>See</u> <u>United States v. Figueroa</u>, 900 F.2d 1211, 1218 (8th Cir.1990) (citation omitted).  "'A motion to strike surplusage from an indictment . . . should be granted only where it is clear that the allegations contained therein are not relevant to the charge made or contain inflammatory and prejudicial matter.'"  <u>United States v. Michel-Galaviz</u>,

415 F.3d 946, 948 (8th Cir. 2005) (quoting <u>Dranow v. United States</u>, 307 F.2d 545, 558 (8th Cir. 1962)).

In support of his motion to strike surplusage, defendant relied on <u>United States v. Roark</u>, 924 F.2d 1426 (8th Cir. 1991).  <u>See</u> Def.'s Reply at p. 9.  In <u>Roark</u>, the jury was told that the defendant was a member of the Hell's Angel's motorcycle gang and then heard substantial testimony about the gang's illegal activities.   According to the trial court in the case, the testimony about the gang was mostly an indictment of the motorcycle gang and did not go really to the guilt or innocence of the defendant.  <u>Id.</u> at 1434.  The Eighth Circuit held that the entire focus of the trial was "guilty by association" and ordered a new trial as a result of the prosecution's "relentless attempt to convict [the defendant] through his association with the motorcycle club."  <u>Id.</u> at 1432, 1434.

However, the Eighth Circuit has held that "[e]vidence of gang membership is admissible if relevant to a disputed issue."  <u>United States v. Lemon</u>, 239 F.3d 968, 971 (8th Cir. 2001) (citing <u>United States v. Sills</u>, 120 F.3d 917, 920 (8th Cir. 1997); <u>United States v. Johnson</u>, 28 F.3d 1487, 1497 (8th Cir.1994), <u>cert.</u> <u>denied</u>, 513 U.S. 1098 (1995)).   The Court concludes that gang affiliation is relevant to the issue of the existence of a conspiracy and is relevant to show the basis of the relationship between defendants who allegedly participated in the drug distribution operation.  <u>See</u> <u>United States v. Brown</u>, 200 F.3d 700, 708 (10th Cir. 1999) (concluding that gang affiliation evidence is relevant to demonstrating the existence of a conspiracy); <u>see</u> <u>also</u> <u>United States v. Sloan</u>, 65 F.3d 149, 151 (10th Cir. 1995) (holding "gang activity" evidence admissible "to prove the existence of a conspiracy and to show the basis of the

61

relationship between the defendant and witnesses who participated in the drug distribution operation."); United States v. Johnson, 28 F.3d 1487, 1497 (8th Cir. 1994), cert. denied, 513 U.S. 1098 (1995) (allowing evidence of gang membership to clarify connections between defendants in drug distribution conspiracy case).   Given the relevance of gang affiliation to the existence of a conspiracy alleged in Counts 1 and 2 of the Indictment, defendant's motion to strike surplusage should be denied.

## III.   RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein,

**IT IS RECOMMENDED THAT:**

1.   Joe Darrell Edwards's Motion for Suppression of Confessions or Statements [Docket No. 209] be **DENIED**;

2.   Joe Darrell Edwards's Motion to Suppress Evidence Obtained as a Result of Search and Seizure be **DENIED**;

3.   Joe Darrell Edwards's Motion for Suppression of Records of Electronic Surveillance [Docket No. 214] be **DENIED** as moot based on the pre-hearing submission of the Government and the representations of defendant's counsel during the hearing;

4.   Joe Darrell Edwards's Motion to Dismiss Counts 1, 2, and 9 [Docket No. 215] be **DENIED**.

5.   Joe Darrell Edwards's Supplemental Motion to Dismiss Counts 1, 2 and 9 [Docket No. 318] be **DENIED**; and

6.      Joe Darrell Edwards's Motion to Suppress Witness Identifications [Docket

No. 321] be **DENIED**.

Dated:       June 13, 2008

s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **June 23, 2008**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.