# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,                          Criminal No. 07-297(3) (DWF/JSM)

                Plaintiff,

v.                                                 **FINDINGS OF FACT,**
                                                   **CONCLUSIONS OF LAW,**
                                                   **ORDER FOR CONVICTION**
Joe Darrell Edwards, Jr.,                          **AND MEMORANDUM**
a/k/a Jodebe,

                Defendant.

---

David P. Steinkamp and Steve L. Schleicher, Assistant United States Attorneys, United States Attorney's Office, counsel for Plaintiff.

Jordan S. Kushner, Esq., Law Office of Jordan S. Kushner, counsel for Defendant.

---

Trial was held in this matter before this Court on July 10-11, 14-16, 18, and 21-22, 2008 and August 4, 2008.[1]  The Defendant Joe Darrell Edwards, Jr, also known as Jodebe ("Defendant"), was charged by an Indictment filed August 22, 2007, along with eleven other individuals.

The Defendant was charged in Count 1 of the Indictment with engaging in a conspiracy, between the years 1990 and 2007, to distribute and possess with the intent to distribute fifty or more grams of cocaine base, or crack cocaine, in violation of 21 U.S.C.

---

[1]     The Defendant waived his right to be tried by a jury, the United States consented to holding a bench trial, and this Court approved under Federal Rule of Criminal Procedure 23(a).

§§ 841(a)(1), 841(b)(1)(A), and 846.   In Count 2 of the Indictment, Defendant was

charged with engaging in a conspiracy, between the years 1990 and 2007, to possess

firearms during and in relation to a drug trafficking crime in violation of 18 U.S.C.

§ 924(o).  Finally, in Count 9 of the Indictment, the Defendant was charged with aiding

and abetting distribution of cocaine base, or crack cocaine, in that the government alleged

that on or about October 15, 2005, in Minnesota, the Defendant aided and abetted, and

being aided and abetted by others, he knowingly and intentionally possessed cocaine

base, or crack cocaine, with the intent to distribute it in violation of 21 U.S.C.

§§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2.   The Defendant plead not guilty as to

all counts.

Based upon the presentations of counsel, the testimony of more than 40 witnesses,

the numerous exhibits received, and the Court being otherwise duly advised in the

premises, the Court hereby makes the following:

### FINDINGS OF FACT

1.     A street gang known as the Rolling 30's Bloods, or "R.T.B. gang," operates

within a neighborhood of South Minneapolis encompassing those blocks that are

numbered in the 30's, i.e., 31st Street, 32nd Street, etc . . . .  The territory of the Rolling

30's Bloods is bordered at the northern edge by Lake Street (which would otherwise be

numbered 30th Street), at the southern edge by approximately 42nd Street, at the eastern

edge by approximately Nicollet Avenue and at the western edge by approximately

Bloomington Avenue or Eliot Avenue.  This portion of South Minneapolis is largely a

2

residential, working class neighborhood, with commercial nodes comprised primarily of small shops.  The Court finds, based upon the record before it, that the primary purpose for establishing the territory of the Rolling 30's Bloods was to control the sale of drugs within their territory to the exclusion of all others, including rival gangs.

2.      The Defendant is a member of the R.T.B. gang.  The Defendant originally joined the gang in about 1983, when he was approximately 12 years old.  The Court heard testimony, which it found credible, that the Defendant's status within the gang is that of an "Original Blood," or "O.B." or stated otherwise, an "Original Gangster" or "O.G."  O.B.s and O.G.s are older, generally more respected, members of the gang.

3.      The Rolling 30's Bloods are an exclusive group.  Members are either "blessed in" due to family ties, or "jumped in" by being beaten up.  R.T.B. gang members identify themselves to outsiders and to each other by making certain hand gestures or "gang signs," and by wearing red clothing.  Gang members also communicate in a form of code.  The Court heard testimony, which it found credible, that the R.T.B. gang is a rival of the Crips gang and, therefore, R.T.B. gang members substitute the letter "b" for the letter "c" while speaking and writing to each other as a method of showing a lack of respect for the Crips.  R.T.B. gang members also strike through the letter "c" in their written communication as a similar form of disrespect to the Crips.

4.      R.T.B. gang members also show their affiliation to the gang by getting R.T.B.-specific tattoos.  For instance, gang members have tattoos stating "Blood Love," "30s," or "Peace in Love."  "Peace in Love," or its abbreviated form "P.I.L.," is a phrase

used by the R.T.B. gang to pay respect to a gang member who has died, a substitution for saying "Rest in Peace."  The Defendant has a tattoo that says "30" on his right arm. Gov't Ex. 67.

5.      At some point during its history, which the Court finds to be not sooner than 1992 based upon the record before the Court, members of the Rolling 30's Bloods established themselves as the exclusive crack cocaine dealers within their territory.  The Court heard testimony from four R.T.B. gang members:  Solomon Shannon ("Shannon"); George Dixon ("Dixon"); Calvin Ferguson ("Ferguson"); and Jomoy Lee ("Lee"), that there was an agreement and understanding among the members of the gang to sell drugs within their territory, and to ensure that the territory was protected from rival gang encroachment through the use of violence.  For instance, Dixon testified that an R.T.B. gang member could sell drugs anywhere within the neighborhood, but testified that anyone selling drugs in the territory who was not in the R.T.B. gang would be robbed or shot at by R.T.B. gang members.  Similarly, Shannon testified that he became a member of the R.T.B. gang in 1992 so that he would have a place to sell drugs, and that he was not able to sell drugs within the R.T.B. territory before he became a member.[2]  Lee testified that the agreement among the gang members was to help each other prosper, specifically with relation to drug sales, which involves helping each other with drug sales and loaning each other guns.  Selling crack cocaine within the R.T.B. territory was a

---

[2]      The Court found credible Shannon's testimony that he was unable to sell drugs within the territory before he became a member of the R.T.B. gang in 1992 and, therefore, the Court finds that the R.T.B. gang had established its exclusive territory by the year 1992.

routine event and became a primary purpose and activity of the gang.  All four gang member witnesses testified that the Defendant was a party to this agreement and understanding.  The Court found this testimony to be credible.

6.      Shannon, Dixon, Ferguson, and Lee testified as to the roles played by different members of the gang.  The R.T.B. gang has a loose structure, at the top of which are O.B.s or O.G.s.  Dixon testified that, when originally formed, the R.T.B. gang had a more hierarchical structure like that of the Chicago gangs, the Vice Lords and the Gangster Disciples, or "G.D."  Dixon testified that later the R.T.B. gang adopted a structure more like that of the Los Angeles gangs, which was more free form and in which members had fewer people to whom they had to answer.  Dixon testified that the O.G.s in the R.T.B. gang can still tell other members what to do.  Ferguson testified that as an O.G. the Defendant is at the highest level of membership in the R.T.B. gang and that O.G.s can sit back and reap the benefits from protection of the territory.  Ferguson also testified that the gang recruits young males, called "shorties," to carry and sell drugs because, as juveniles, if they are caught, they will "get a slap on the wrist."  Shorties are at the bottom of the gang structure and sometimes serve as look-outs while other members are selling drugs.  The Court found this testimony to be credible.

7.      The Court heard credible testimony from all four R.T.B. gang members that a member may rise in status and respect in the gang by "putting in work."  There are various ways in which a member can put in work, among them by selling drugs, robbing people in the neighborhood, shooting at rival gang members, or by painting graffiti and

gang symbols in the neighborhood to mark their territory.  Dixon testified that these

activities are part of the understanding among gang members that the members will sell

drugs, help each other when needed with fighting and shooting, and stick together like a

brotherhood.  Dixon testified that it is not possible to hang around the gang and not

participate in its activities and, therefore, a person is not able to claim gang membership

and then refuse or fail to put in work.  All of the methods by which a member may put in

work benefit the ultimate goal of the R.T.B. gang, which is to hold their territory to have

an exclusive market for drug sales.

8.      The Court also heard testimony that gang members who seriously identify

with the gang's values and rules, and who provide an example to other members of the

gang, are called "riders."  Dixon testified that a rider is someone who upholds the gang, is

a troubleshooter, puts in work, and is an outstanding member.  Dixon testified that a

member cannot be a rider without engaging in criminal activity.  Shannon testified that a

rider is someone who does what they are supposed to do to keep the neighborhood

"Bloods only."  Ferguson testified that a rider is a gang member who is very active, who

protects the neighborhood, and puts in work.  Lee testified that a rider is a gunslinger, and

a tough guy, and that if one represents himself as a rider, he is indicating he is a member

of the gang.

9.      Numerous police officers, as well as Shannon, Dixon, Ferguson, and Lee,

testified regarding the way in which the gang sold drugs.  All of these witnesses testified

that R.T.B. gang members sell crack in their territory, particularly at certain intersections

within the neighborhood, in small amounts such as one or two rocks of crack cocaine at a time.   Shannon identified such small amounts as .2 gram rocks which would be sold for $20, and .5 gram rocks which would be sold for $50.   The Court heard testimony from both the gang members and police officers that often the sales transactions are brief hand-to-hand encounters in which a customer walks or drives up to a gang member on the street, and the drugs and money are quickly exchanged.   Shannon testified that the transaction could take thirty seconds to one minute.   The Court found this testimony to be credible.

10.     The Court heard testimony that R.T.B. gang members generally carry smaller amounts of crack with them because if they are caught with one or two rocks of crack, they can claim they intended to use the drugs themselves and, if they are charged with drug possession, they may be diverted to a drug court program rather than being sent to prison.   Shannon also testified that the gang members understand that if they are caught with larger amounts of drugs, the may receive longer sentences.

11.     Evidence was also presented regarding the methods R.T.B. members use to conceal drugs on their bodies and elsewhere.   The Court heard testimony that R.T.B. gang members conceal rocks of crack cocaine in their clothing, such as in a shoe or in the corner pocket of their jeans, or on their bodies such as in their mouths, under or around their genitals, and between their buttocks.   Ferguson testified that gang members hide drugs between their buttocks because they know the police are unable to perform a strip search of them without probable cause.

7

12.     In addition, the Court heard testimony that R.T.B. gang members have hiding places within the neighborhood where they stash drugs.  Ferguson testified he hid his crack "down the block," so he would not get caught with drugs on his person, and described hiding crack cocaine in potato chip bags.  The Court also heard testimony from Minneapolis Police Officer Dave Ploeger ("Ploeger"), that he discovered rocks of crack within a "Mike & Ike's" candy box stuck between the bricks of a building at the corner of 38th Street and Chicago Avenue South, which intersection was described as a major drug dealing corner within the R.T.B. territory by many witnesses.  Officer Ploeger testified that immediately after discovering the crack cocaine in the Mike & Ike's box, he discovered more crack cocaine wrapped in a Starburst candy wrapper at the same location.  The Court found this testimony to be credible.

13.     Gang members in possession of drugs will run from police to avoid being caught with drugs on their person.  Ferguson testified that gang members know every alley in the neighborhood, and which gates open and do not open, so that they can run away from police.  Ferguson described an incident in which he and another gang member were chased by the police; Ferguson stopped and allowed himself to be caught while the other gang member, who had crack cocaine on him, got away.  Ferguson also testified that gang members will toss crack away from themselves to avoid being caught with it. The Court found this testimony to be credible.

14.     The Court also heard testimony about the way in which drugs are distributed within the gang.  Ferguson testified that gang members prepared the crack by

cooking it with baking soda, and when one member had a larger amount of crack, other members would meet up to break up the crack and sort it into baggies for sale. Some members, such as Dixon and Lee, were considered "plugs," which means that they were drug suppliers to other gang members. The Court found this testimony credible.

15. R.T.B. gang members could buy drugs from sources outside the gang, but buying from a member of the gang benefited them because gang members sell drugs to other gang members at discounted prices, resulting in higher profits for the individual selling the drugs. Lee testified that he would charge a gang member $80 for an "8-ball" of crack cocaine, but would charge a non-gang member $120 or $125 for the same amount of drugs. R.T.B. gang members might also give drugs or pass along customers to other gang members who needed help, such as when a member gets out of jail or prison and returns to the neighborhood. The Court found this testimony credible.

16. The Court heard testimony about the amount of crack the R.T.B. gang possessed and sold. Shannon testified that he is currently incarcerated because he was arrested with 23 grams of crack cocaine. Shannon also testified that when he was on the streets, he received crack from his suppliers within the gang in the amount of one-quarter to one-half an ounce, that he broke this amount into smaller quantities, that he then sold crack cocaine in $20 and $50 amounts, and that he made $500 to $1,000 per day doing so. Dixon testified that when he was actively selling crack, he sold around one kilogram ("kilo") of crack cocaine per week and that the R.T.B. gang as a whole sold approximately five kilos per week. Lee stated he personally could sell one ounce to two

ounces per week.  Ferguson testified that the most crack cocaine he had seen in one

location was 2 bricks of crack, or 32 ounces.  Minneapolis Police Officer Kelly O'Rourke

("O'Rourke") testified that during a stop of a car driven by gang member Devord, or "Big

Frank," Allen, who was identified as a plug within the gang, the police seized 115.79

grams of crack cocaine.

17.     The Court heard testimony, which it found credible, that gang members

engage in violence, including gun violence, directed toward any rival gangs who attempt

to sell drugs within the R.T.B. territory.  The Court heard credible testimony that rival

gang members who sold drugs within the R.T.B. territory, or who even displayed their

own colors and gang symbols within the R.T.B. territory, could expect to be robbed,

beaten, or potentially shot at and killed.  The Court heard testimony from Shannon,

Ferguson, and Dixon that they had shot at members of rival gangs in their territory.

Ferguson also testified that he had been shot several times himself.  According to the

testimony at trial, the R.T.B. gang members wanted to ensure they had a reputation for

being violent to prevent other gangs from attempting incursions into the R.T.B. territory

to take over drug sales.  Ferguson testified that gun violence also occurs in the areas

where the boundaries of the R.T.B. gang's territory and that of rival gangs meet because

in those areas members of each gang are competing for drug sales.

18.     The Court heard credible testimony that gang members obtained guns in a

variety of ways, including by trading drugs for guns and by stealing guns.  The Court also

heard credible testimony that a member of the gang could call or visit another member

and ask for a gun, and the request would be granted with no questions asked, and that R.T.B. members carried guns when they went out to sell drugs.  Dixon testified that it was part of the agreement or understanding among the members of the gang that they would have guns available to them during their drug trafficking activities.  Shannon testified that if a group of gang members were together on the street corner, at least four or five would have a gun and that this gave them safety because a gang member with a gun would be obligated to respond to any attack on the group.  Lee testified that he had guns he considered "throw aways" that he made available to gang members without expecting anything in return other than loyalty.  Ferguson testified that gang members carried guns when they were in their territory in case they were robbed and used the guns to protect the neighborhood.  Ferguson further testified that, without question, gang members can easily get guns from one another.

19.     The Court also heard credible testimony from both police officers and the gang members that R.T.B. gang members stashed guns around the neighborhood, in bushes and elsewhere, and the Court heard credible testimony regarding numerous occasions when police officers found guns within the R.T.B. territory.  For instance, Officer Ploeger testified that after discovering crack cocaine hidden in a candy box and candy wrapper at 38th and Chicago, he and K-9 Officer Daniel Ungurian discovered a loaded Muzzlelite .223 semi-automatic rifle, with a bullet in its chamber, lying on the ground underneath a black sweatshirt in a nearby yard.  Officer Ungurian also testified regarding the discovery of this gun.  The Court received into evidence the Muzzlelite rifle

as Exhibit 43.4 and the sweatshirt in which it was wrapped as Exhibit 43.6.  Ferguson

testified that he recognized this weapon and that it was available to all gang members for

use.

20.     The Court finds, based on the record before it, that the R.T.B. gang

members' possession and use of firearms facilitated their individual drug sales and also

was necessary to hold as an exclusive drug market the territory within which the drug

sales were occurring.

21.     The Court heard credible testimony about the Defendant's own possession

and sale of crack cocaine.  Shannon testified he had seen the Defendant dealing crack

cocaine in the R.T.B. gang's territory within the last five years, and that he had seen the

Defendant with .5 ounces of crack cocaine on more than one occasion, though he did not

remember specific dates he had seen the Defendant sell drugs.  Shannon also testified that

he saw the Defendant buying drugs during the summer of 2005.  The Court received into

evidence records showing that the Defendant was released from custody from the

Minnesota Department of Corrections ("Minnesota DOC") in June 2005 and was outside

of confined settings for all but a few days in July 2005 and for all of August 2005.

Shannon testified that he was released from a 6-month period of confinement in August

2005.  Def. Exs. 1, 3.  Shannon also testified that the Defendant is a "jacker," which he

defined as someone who sets up a deal to buy drugs, but instead steals them.  The Court

found this testimony to be credible.

22.    Dixon testified that he supplied, or plugged, the Defendant with drugs by giving him 3.5 grams of crack cocaine, or an 8-ball.  Dixon testified that he gave the Defendant the drugs because the Defendant had just been released from prison and needed help getting on his feet again, which is something that gang members would do for other gang members as part of their agreement.  Dixon testified that the event must have occurred in August 2007 or afterwards, because Dixon bought a truck in August and remembered being in his truck at the time.  Records from the Minnesota DOC indicate that the Defendant was released from prison in August 2007.  Def. Ex. 3.

23.    Ferguson testified that he had seen the Defendant selling crack cocaine within the R.T.B. territory within the last five years.  Ferguson testified that it did not matter that the Defendant had been in prison, because, as an O.G., the Defendant has clout and can return to sell drugs in the territory as though he never left.  Ferguson testified that he supplied the Defendant with drugs and with the understanding that the drugs were for the Defendant to sell.  Ferguson testified that he gave the Defendant drugs and would not ask him to pay for them.

24.    Lee testified that he plugged the Defendant with an 8-ball of crack cocaine for $85 or $90, and that the Defendant told Lee that he "had a stang up the road."  The Court heard testimony that a "stang" is a term for a crack cocaine customer.  Lee also testified to giving the Defendant a "care package" when the Defendant was released from prison, indicating that he gave the Defendant drugs to help him get on his feet and to look out for him, because the Defendant is "a Blood."  Lee testified that he supplied the

13

Defendant with crack cocaine regularly at times, up to two to three times per week, in 2004 and 2005, but Lee admitted that he was "not too confident" on the timing of these events. The Defendant was incarcerated for much of 2004 and for some portions of 2005, but was also unconfined for many periods of time during 2005. Def. Ex. 3. Indeed, during several time periods in 2005, the Defendant was considered by the Minnesota DOC to have absconded from his intensive supervised release ("ISR") conditions and his whereabouts were unknown to the Minnesota DOC. In addition, as discussed below, the Defendant was caught in possession of crack cocaine during one of the periods in 2005 during which he was not confined.

25.     The Court found the testimony of the four gang member witnesses regarding the Defendant's sale of crack cocaine to be credible, notwithstanding that the gang members could not identify the specific date or dates on which they gave or sold drugs to the Defendant or saw the Defendant selling drugs. Based on the evidence introduced at trial, crack cocaine sales were a regular, day-to-day occurrence for gang members. Indeed, Shannon testified that drug sales at certain neighborhood hot spots went on every day, all day and all night long. The Court finds that crack cocaine sales by R.T.B. members were not the type of event for which a gang member would keep any record, much less a calendar record, and individual instances of drug sales would not be an especially memorable event. Ferguson specifically testified as to whether he remembered specific instances of the Defendant's drug sales by stating: "I don't be on his back when he's selling."

14

26.     Evidence introduced at trial also shows that the Defendant has been caught in possession of crack cocaine by Minneapolis police officers.  The Defendant was caught possessing crack cocaine on October 15, 2005.  Minneapolis police officer Jeff Peterson testified that he responded to a call regarding a disturbance from the Green Mill restaurant on Hennepin Avenue in Minneapolis, and when he arrived, he found the restaurant's manager holding down the Defendant.  A search revealed two rocks of crack cocaine rolled up in a paper towel in the Defendant's sock.

27.     The Defendant also was apprehended in possession of crack cocaine on December 21, 2005.  Minneapolis police officer Geoff Toscano testified that he was working in the R.T.B. gang's territory when he received word that the Defendant had been seen by another officer engaging in a hand-to-hand drug transaction around the intersection of 38th Street and Chicago Avenue South.  Officer Toscano testified that he started driving toward the area and identified the Defendant based on the description he had been given.  Officer Toscano testified that the Defendant entered the Super America gas station store at the intersection of 38th Street and Chicago Avenue South, and, through the front door, the officer witnessed the Defendant drop two rocks of a substance the officer suspected to be crack cocaine.  The Defendant was placed under arrest. Minneapolis Police Officer Mark Johnson was also present at this incident, and he testified that as he escorted the Defendant to the squad car, the Defendant stated, "That's not my stuff," but then stated, "You gonna take me down for two or three pills?"  Testing showed that the substance was, in fact, crack cocaine.

28.     The Defendant has also admitted to selling crack cocaine.  The Defendant was interviewed by Officer O'Rourke on December 30, 2005.  Gov't Exs. 50.1, 50.2.  In the recorded interview, the Defendant is asked whether he sells cocaine, and the Defendant replied:  "No not really.  I'm more of a user."  *Id*.  However, the Defendant also stated:  "I've sold cocaine in the past."  *Id*.

29.     The Court heard credible testimony that the Defendant had himself possessed guns in connection with his involvement in the R.T.B. gang's activities.  Shannon testified that he had seen the Defendant with a .32 Magnum in the past and that he had seen the Defendant with that gun on more than one occasion.  Ferguson also testified he remembered seeing the Defendant with a gun at fellow gang member Nate Dixon's house.

30.     Police officers also testified credibly about instances in which the Defendant possessed guns.  Minneapolis Police Officer Chris Abbas testified to an interaction with the Defendant in 1994 in which Officer Abbas and his partner responded to a noise complaint at an apartment where they found the Defendant present along with other R.T.B. gang members.  Officer Abbas testified that the Defendant appeared in the doorway of the apartment and said to another person in the apartment, "Go get the gun.  We'll handle this."  Upon a search of the apartment, the officers discovered a loaded .38 revolver.

31.     In another incident, the Defendant was observed engaging in behavior consistent with street-level drug dealing by Minneapolis Police Officer Chris Carlson on

16

June 30, 2000.  Officer Carlson testified that on that evening around 10:00 or 10:30 p.m., he was patrolling in the R.T.B. territory and he observed the Defendant flag down a car by waving at it and approach the driver's side of the car.  Officer Carlson testified that this behavior was consistent with street level drug sales in that neighborhood, and he believed a drug sale was about to be committed.  Officer Carlson testified that he pulled up in his squad car, at which time the Defendant saw the car and ran away, grabbing his waistband as he ran and that the Defendant jumped over a fence.  Officer Carlson testified that the Defendant ignored Officer Carlson's direction to stop because the Defendant was under arrest.  Officer Carlson stated he believed that the Defendant had a gun and, after searching the area where the Defendant had been, Officer Carlson found a small black Smith & Wesson semi-automatic handgun.  The Court found Officer Carlson's testimony as to the events he witnessed and as to the nature of the Defendant's behavior to be credible.

32.     The Defendant was incarcerated or confined in several settings for a large portion of the time period over which the Indictment alleges the conspiracy among the R.T.B. members took place.  The Court heard testimony and received evidence, however, regarding R.T.B. gang members' continued participation in gang activities while incarcerated.  Shannon testified that he himself remained a member of the R.T.B. gang, and the agreement among the members with respect to drug sales and their territory, even while he was in prison.  Shannon testified that gang membership could provide benefits while in prison, such as protection for a gang member, as well as benefits upon release

17

because the released gang member could return to the neighborhood and have a place to sell drugs and could also receive drugs and money from other members.

33.     Dixon also testified that gang membership could continue while a member was in prison.  Dixon testified that gang politics exist in every prison and that imprisoned gang members are like a family when they are incarcerated.  Dixon indicated that there are expectations for gang members such as being required "to represent" and uphold the gang.  Gang members do this by fighting rival gangs who are disrespectful to the R.T.B. gang.  If a gang member did not represent in prison, he would be labeled weak and "a punk."  Dixon testified that if a member upholds the gang in prison, the member can expect a "hand out" when he comes back to the gang's territory.   Dixon testified that when he was released from incarceration, he returned to the R.T.B. territory to sell drugs. Shannon also testified that when he was released from prison, he could return to the gang's territory to sell drugs.   The Court found this testimony to be credible.

34.     The evidence introduced at trial showed that the Defendant continued to maintain his gang membership, and also continued to engage in activities designed to perpetuate the gang's goals, while he was incarcerated.  The Court received as Government Exhibit 107.4 the Defendant's prison-issued jeans, on which a red thread was sewn at the waist band.  Erin Spruance, an investigator with the Minnesota DOC and a member of the Metro Gang Strike Force, testified that the red thread constituted an alteration of the Defendant's prison uniform in violation of prison rules.  Extensive evidence was produced at trial that the color red is identified with the R.T.B. gang, and

18

the Court received into evidence several articles of gang members' clothing displaying the color red.

35.     The Court also received as exhibits numerous letters and notes written by the Defendant to other incarcerated gang members using language and codes specific to the R.T.B. gang.  The Defendant wrote one such letter to Shannon in 1997 on a form titled "Information/Interview Request and Response," in which he identifies his job location as "CK-Ridin," with a strike through the letter "c," and his living unit as "CK-House," also with a strike through the letter "c."  Gov't Ex. 11.1.  The Court heard credible testimony that the abbreviation "CK" stands for "Crip Killer."  In the letter, the Defendant admonished Shannon for failing to uphold the gang while in prison, stating: "Sound like you need some get-right nigga.  You over there letting niggaz disrespect. Fuck that Blood."  *Id*.  The Defendant further stated:  "And if you forgot these 30'z is 4-Ridaz only."  *Id*.  The Defendant closed the letter with the statement "30 4-life."  *Id*.

36.     The Defendant also wrote to fellow gang member Eddie Santiago in 2005, addressing the letter to "Crab Krusha," with a strike through the letter "c."  Gov't Ex. 41.1.  The Court heard testimony that this is another way of saying Crip Killer and is disrespectful to that rival gang.  The Defendant used a Minnesota DOC Offender Kite Form,[3] on which the Defendant indicated his offender identification number ("OID") was "R.T.B.," his Facility/Unit was "B" and his Room/Cell was "30."  *Id*.  The letter closes with the expression "Damu Love."  *Id*.  The Court heard testimony that damu is the

---

[3]     The Court heard testimony that kite forms are forms used within the Minnesota DOC for offenders to communicate with staff members, and the form so states.

Swahili word for blood, that R.T.B. gang members use the term when addressing each other.

37.     In a June 2005 letter to Myon Burrell ("Burrell"), another gang member, the Defendant writes:  "Ya-lookin Good *YG*."  Gov't Ex. 40.1.  The Court heard credible testimony that the abbreviation "YG" stands for "Young Gangster," which is a rank for younger members of the gang.  Throughout the letter the Defendant crosses through the letter "c" and substitutes the letter "b" for the letter "c."  *Id.*  The Defendant refers to Burrell as "Damu," and closes his letter with "Six One Two Foe Life," referencing the telephone area code for the area including the R.T.B. gang's territory, and also says "Damu Love 4-Ever."  *Id.*

38.     Another letter written by the Defendant to fellow gang member Jermaine Ferguson, postmarked March 7, 2007, also contains strikes through the letter "c" and addresses Jermaine Ferguson as "Damu."  Gov't Ex. 61.1.  In this letter, the Defendant states:  "Your my Dawg – One of my Relative's I'd Ryde or Die For."  *Id.*

39.     Finally, the Defendant's statement given to Officer O'Rourke in December 2005, is further evidence that the Defendant continued to adhere to the gang's mission, during periods in which he was incarcerated or otherwise confined.  Gov't Exs. 50.1, 50.2.  The Defendant admits to Officer O'Rourke that he is a member of the R.T.B. gang, and says:

> I mean we're probably the most dangerous original Gang in Minnesota.
> Anybody else can say whatever the fuck they want, but the Bloods . . .
> Minnesota belongs to the Bloods as far as street life Gang.  Chicago got the
> ViceLords, the GD's and all that and them other States and what not, but

> when you think about Gangs originating in Minnesota you think about the South Side Rolling 30s Bloods and that's just what it is.  Everybody wants to come after "the King" because everybody thinks Bloods if you want rank, if you want juice, if you want credibility for gang banging or being in the street life you gotta take on the Bloods.

*Id*.  During the statement, the Defendant also identifies his role within the R.T.B. gang, saying he "always put [in] my work . . . I got my stripes."  *Id*.  The Defendant goes on to say:  "*I go to prison I'm a rider and when I go to the Workhouse I'm a rider and when I come down to County Jail I'm a rider and when I'm on the streets I'm a rider*."  *Id*. (Emphasis added.)

40.     The Defendant's use of the R.T.B. gang's code in his letters to other gang members, his references to the R.T.B. gang being for riders only and his identification of himself as a rider, and his references to membership in the gang being for life, shows that the Defendant actively continued his membership in the gang, and its underlying purposes and agreements, even though the Defendant was incarcerated and not then operating in the gang's territory.

41.     Based on the evidence introduced at trial, the Court finds that the Defendant was a member of the R.T.B. gang, and also that the Defendant engaged with the other members of the gang in a conspiracy to possess crack cocaine with the intent to distribute such drugs.  The Court also finds that the Defendant was a member, together with other R.T.B. gang members, in a conspiracy to possess firearms in connection with their drug trafficking activities.

42.     There was no evidence produced at trial showing that the Defendant ever took any affirmative steps to withdraw from the conspiracy during the time he was incarcerated or at any other time.  The Defendant called Corey Byrd ("Byrd") to testify on his behalf.  Byrd testified that he had known the Defendant for many years and was himself a member of the precursor organization to the R.T.B. gang as it exists today.  According to Byrd, who is now engaged in anti-gang activities in the community, at the beginning the gang was called "Blood Family," and at this time the membership was not actively engaged in a conspiracy to sell drugs, though some members of the group were engaging in illegal acts.[4]  Byrd testified that following the Defendant's release from prison, the Defendant approached him about finding a job, and Byrd believed that the Defendant was sincere about having a desire to turn his life around because the Defendant returned to talk with Byrd several times.  Even if true, this testimony does not show the Defendant had extricated himself from the R.T.B. gang's conspiracy.

43.     The Court heard evidence Defendant used crack cocaine himself and the Defendant advanced a theory at trial that he was not a drug dealer because he was a user.

---

[4]     Byrd denied any personal knowledge of illegal activity, such as drug dealing, indicating that he only knew members engaged in these acts by learning about it from what he saw on television.  Byrd presented the early days of the organization as a time in which gang members performed community service in the neighborhood, and settled their differences by sparring with boxing gloves.  The Court found this testimony somewhat incredible, particularly given Byrd's other testimony that he joined the gang because otherwise there were areas of the neighborhood where he could not spend time or hang out, and that he ultimately left the gang because he was faced with a moral crisis arising from continued membership and the gang's activities.  Notwithstanding this, the Court also finds that this testimony was largely irrelevant to the ultimate issues in the case.

Some of the evidence introduced at trial supported the Defendant's claim that he has had a drug habit. Shannon testified that he understood that the Defendant used crack, and in the Defendant's interview with Officer O'Rourke, discussed above, the Defendant states that he smokes crack. The Defendant may be a crack cocaine user, but the Court finds that whether or not the Defendant used drugs himself has little, if any, bearing on whether the Defendant was a member of a conspiracy to possess drugs with the intent to distribute them because the two are not inconsistent with each other. In addition, the Court finds that possession of a small amount of crack cocaine, or a so-called "user amount," is also not inconsistent with the possession of crack cocaine with the intent to sell. This is particularly true given the substantial evidence produced in this case that R.T.B. gang members carried small amounts of drugs that they intended to sell. The intent of the Defendant is determinative, not the amount of the prohibited substance he possessed.

44.     The Defendant suggested that Shannon, Dixon, Ferguson, and Lee fabricated testimony regarding the Defendant in order to receive reductions on their own sentences. The Court does not find this to be true. All four testified that they understood that there was no guarantee that they would receive sentence reductions if they testified. Further, it seems likely to the Court that if the gang members were making up evidence against the Defendant, they would have said things that were more incriminating for the Defendant. The Defendant also asserted that Lee had a motive to lie about the Defendant's involvement in the gang because Lee was robbed by the Defendant's brother and bore a grudge against the Defendant. The Court found Lee's testimony about the

Defendant's participation in the activities of the group credible and Lee's testimony was consistent with that of the other gang members who testified, none of whom would have borne such a grudge.

45.    The Defendant also advanced the theory that while he may have been a member of the gang, he was a minor player, and that gang membership does not equate to participation in a conspiracy to sell drugs or possess guns.  The Court does not base its findings upon the Defendant's membership in or association with a particular group.  The Court's findings are based on evidence that the Defendant was a participant in an agreement or understanding among the members of that group to control their territory for the exclusive sale of crack cocaine, using and through the possession of firearms, and the Defendant's knowing support for, and activities in furtherance of, that agreement.

46.    Based on all of the evidence, and after evaluating the credibility of each of the witnesses, the Court finds that the United States has proven beyond a reasonable doubt that the Defendant was a member of a conspiracy to possess with the intent to distribute fifty or more grams of cocaine base, or crack cocaine during the time period charged in Count 1 of the Indictment, and specifically between the years 1992 and 2007, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846.  The Court further finds that there is no evidence that the Defendant ever withdrew from the conspiracy.

47.    Based on all of the evidence, and after evaluating the credibility of each of the witnesses, the Court finds that the United States has proven beyond a reasonable doubt that the Defendant was a member of a conspiracy to possess firearms during and in

relation to a drug trafficking crime during the time period charged in Count 2 of the

Indictment, and specifically between the years 1992 and 2007, in violation of 18 U.S.C.

§ 924(o). The Court further finds that there is no evidence that the Defendant ever

withdrew from the conspiracy.

48.     Based on all of the evidence, and after evaluating the credibility of each of

the witnesses, the Court finds that the United States has not proven beyond a reasonable

doubt that on or about October 15, 2005, in Minnesota, the Defendant aided and abetted,

and being aided and abetted by others, knowingly and intentionally possessed cocaine

base, or crack cocaine, with the intent to distribute it in violation of 21 U.S.C.

§§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2, as charged in Count 9 of the

Indictment. The Court finds it is entirely possible that the Defendant possessed crack

cocaine on that occasion with the intent to sell it, but that the United States has not met its

burden of proof to show beyond a reasonable doubt that he so intended.

49.     Any conclusion of law which is deemed a finding of fact is deemed

incorporated herein as such.

Based upon the above findings of fact, the Court now makes its:

## CONCLUSIONS OF LAW

1.     The Defendant was charged in Count 1 of the Indictment with engaging in

a conspiracy to distribute and possess with the intent to distribute fifty or more grams of

cocaine base, or crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and

846, beginning in 1990 and lasting until 2007.

2.      In order to prove a conspiracy, the United States must prove:  (1) the
existence of an agreement among two or more people to achieve an illegal purpose;
(2) the Defendant's knowledge of the agreement; and (3) that the Defendant knowingly
joined and participated in the agreement.  *U.S. v. Johnson*, 439 F.3d 947, 954 (8th Cir.
2006).   The agreement may be in the form of a tacit understanding rather than a formal,
explicit agreement.  *Id.*  In the case of a charge under 21 U.S.C. § 846, it is not necessary
for the United States to prove that a member of the conspiracy engaged in an overt act in
furtherance thereof.  *U.S. v. Gaines*, 969 F.2d 692, 696 (8th Cir. 1992); *U.S. v. England*,
966 F.2d 403, 408 (8th 1992).

3.      The Court concludes that the United States has proven beyond a reasonable
doubt that there was an agreement or understanding, beginning in 1992 and continuing
until 2007, among the members of the Rolling 30's Bloods to possess fifty or more grams
of cocaine base, or crack cocaine, with the intent to distribute such drugs, that the
Defendant knew of the agreement or understanding, and that he knowingly joined and
participated in the agreement or understanding.

4.      In Count 2 of the Indictment, the Defendant was charged with engaging in a
conspiracy to possess firearms during and in relation to a drug trafficking crime in
violation of 18 U.S.C. § 924(o), beginning in 1990 and lasting until 2007.

5.      The Court concludes that the United States has proven beyond a reasonable
doubt that the members of the Rolling 30's Bloods had an agreement or understanding to
possess firearms during or in relation to their drug trafficking activities beginning in 1992

26

and continuing until 2007, that the Defendant knew of the agreement or understanding, and that he knowingly joined and participated in the agreement or understanding.  In addition, the Court concludes that the United States has proven beyond a reasonable doubt that at least one member of the conspiracy engaged in an overt act in furtherance of the conspiracy to possess firearms during or in relation to drug trafficking crimes.  *See U.S. v. Hermes*, 847 F.2d 493, 495 (8th Cir. 1988).

6.      In order to withdraw from a conspiracy, the Defendant must demonstrate that he took affirmative action to withdraw by "making a clean breast to the authorities or by communicating his withdrawal in a manner reasonably calculated to reach his co-conspirators."  *U.S. v. Jackson*, 345 F.3d 638, 649 (8th Cir. 2003).  A cessation of activities is not sufficient to show that the Defendant withdrew from the conspiracy.  *Id.* The Court concludes that the Defendant did not withdraw from the conspiracy during any period, whether he was incarcerated or unconfined.

7.      The Court, therefore, concludes that the Defendant is guilty of the offenses charged in Counts 1 and 2 of the Indictment.

8.      Count 9 of the Indictment alleges that on or about October 15, 2005, in Minnesota, the Defendant aided and abetted, and being aided and abetted by others, knowingly and intentionally possessed cocaine base, or crack cocaine, with the intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2.

9.      The Court concludes that the United States has not proven beyond a reasonable doubt that the Defendant intended to distribute the cocaine base, or crack

cocaine, found hidden in his sock on October 15, 2005.  The evidence produced at trial was sufficient to show that it was possible the Defendant possessed crack cocaine on that occasion with the intent to sell it, but not sufficient to show beyond a reasonable doubt that he did so.

10.   The Court, therefore, concludes that the Defendant is not guilty of the offense charged in Count 9 of the Indictment.

11.   Any finding of fact that is deemed a conclusion of law is deemed incorporated herein as such.

Based upon the above Findings of Fact and Conclusions of Law, the Court hereby makes the following:

## ORDER FOR CONVICTION

1.   As to the offense charged in Count 1 of the Indictment, that the Defendant was a member of a conspiracy to possess fifty or more grams of cocaine base, or crack cocaine, with the intent to distribute such crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, the Defendant is guilty;

2.   As to the offense charged in Count 2 of the Indictment, that the Defendant was a member of a conspiracy to possess firearms during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(o), the Defendant is guilty;

3.   As to the offense charged in Count 9 of the Indictment, that the Defendant aided and abetted, and being aided and abetted by others, knowingly and intentionally

possessed cocaine base, or crack cocaine, with the intent to distribute it in violation of 21

U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2, the Defendant is not guilty;

    4.     The Court directs the Clerk of Court to enter convictions consistent with

this Order; and

    5.     The Court directs the United States Probation Office to prepare a

presentence report pursuant to the guilty verdicts contained herein.


Dated:  September 5, 2008          s/Donovan W. Frank
                                 DONOVAN W. FRANK
                                 Judge of United States District Court

## MEMORANDUM

    The Court has concluded that the United States established by proof beyond a

reasonable doubt that the Defendant, Joe Darrell Edwards, Jr., a/k/a Jodebe, committed

the offense of conspiracy to possess with the intent to distribute fifty or more grams of

cocaine base as set forth in Count 1, and the offense of conspiracy to possess firearms

during and in relation to a drug trafficking crime as set forth in Count 2 of the Indictment.

The Court also concluded that the government failed to establish by proof beyond a

reasonable doubt that Defendant aided and abetted, and being aided and abetted by

others, knowingly and intentionally possessed cocaine base, or crack cocaine, with the

intent to distribute on or about October 15, 2005, as set forth in Count 9 of the

Indictment.

The Defendant asserted correctly throughout the trial that merely becoming a member of the Rolling 30's Bloods is not tantamount to being guilty of the conspiracy counts alleged in the Indictment.  However, contrary to the Defendant's zealous assertions that this is a case of nothing more than guilt by association, suspicion, inflammation, or, worse case scenario, guilt by manufactured testimony, the United States has proven more than the Defendant's mere membership in the R.T.B. gang.  Instead, the United States proved that the Defendant was a participant in an agreement or understanding among the members of the Rolling 30's Bloods to control their territory as an exclusive market for the sale of crack cocaine.  The evidence established that the Defendant knew full well the primary purpose and goal of the R.T.B. gang, which was to control and hold the territory noted in the Findings of Fact and Conclusions of Law for this exclusive drug market, and further, the Defendant and other members of the R.T.B. gang clearly possessed and used firearms to facilitate their individual drug sales and hold the territory in question.

Admittedly, there could have been numerous reasons for the Defendant to join the R.T.B. gang as a 12-year-old child other than to be a participant in these conspiracies, including his family ties, his feeling a need to belong, and, perhaps at times in the early years, to perform community service work, although the record as to the type of community service R.T.B. gang members performed was never developed.  The Court heard testimony that the R.T.B. gang members recruited children between the ages of 8

and 12 years old to be members of the gang, and it is difficult to conclude that such children have crack dealing and using gun violence as their purpose when they join.[5]

Sadly, that is the purpose of the R.T.B. gang. As the Defendant himself acknowledged in a statement given in December of 2005, he and other members of the R.T.B. gang prided themselves in being known as the most dangerous original gang in Minnesota and violence—specifically gun violence—was the way the R.T.B. gang members obtained and maintained their version of "respect," and controlled their territory to maintain their exclusive market for drug sales. Brotherhood as an R.T.B. gang member, including for the Defendant, became synonymous with selling drugs, an activity which is most gang members' sole or primary economic vocation. Brotherhood also involved protecting their drug market by assisting one another when needed with fighting and shooting people. Indeed, the R.T.B. gang's trademark became violence, thereby preventing other gangs from making incursions into their exclusive territory, and firearms

---

[5]      The Court heard a good deal of testimony regarding the recruitment of young male children into the R.T.B. gang, including that they may be beaten by gang members as a rite of passage to become members. The Court also heard evidence as to the criminal activities into which these young children and men are lured by gang members. Ultimately, the Court learned through testimony that the members of the gang generally do not finish their education and drug dealing is their primary form of employment. Whether families, schools, and the community have failed these young people is a question not before this Court. What is tragically apparent, however, is that many of these young men see gang membership as their only hope and opportunity, as opposed to education, employment, or other means for a better life. We must assure that every young person, whatever their race, gender, creed, color, family background or neighborhood, has the support necessary to learn the value of education and the freedom and opportunity that accompany a good education. Such goals were not on the mind of the Rolling 30's Bloods gang members, and, consequently, bright futures are being exchanged for prison beds. Our young people deserve more.

were essential to that mission.  In the process, the R.T.B. gang ran roughshod over the neighborhoods in which they operated, and where many non-gang affiliated citizens live, creating a community in crisis.

The testimony at trial showed that members of the R.T.B. gang also have a sophisticated plan to circumvent the legal system.  The R.T.B. gang recruits 8- to 12-year-old children to serve as look-outs for law enforcement during their drug dealing activities and uses juveniles to commit crimes because they are unlikely to be heavily charged and penalized if they are caught.  R.T.B. gang members carry small amounts of crack cocaine with them so that if they are caught they can claim the crack was for personal use and be diverted to the State of Minnesota's drug court system rather than being sent to prison.  R.T.B. members will throw crack away from themselves onto the ground, or will hide crack and guns in the neighborhood where they can be easily reached, but are out of sight, in order to prevent the police from catching them with guns or drugs on their persons.  As a result, drugs are stashed in candy wrappers, and guns are on the ground and in bushes, at the ready for gang members to claim, but also for the children of the neighborhood potentially to find.

The Defendant submitted a well-prepared timeline explaining the extensive amount of time since 1990 that he has been in prison or otherwise confined and those times he has been on the street.  The Findings of Fact and Conclusions of Law of this Court are consistent with the Defendant's timeline and no evidence showed that the Defendant took any affirmative step whatsoever to withdraw from the conspiracy during

the time he was incarcerated or at any other time.  In fact, the Defendant proudly proclaimed his affiliation with the R.T.B. gang while in prison and when questioned by the police, making clear that he was an active R.T.B. gang member, a "rider," and he even attempted to keep other gang members in prison in line.

The Court concludes that, notwithstanding the long span of time of the conspiracy alleged in the Indictment, the Defendant's due process rights are not violated in this case. The Court has found that the conspiracy lasted from 1992 and continued until 2007 and that the activities of the R.T.B. gang involved daily drug sales, gun violence, and maintaining the exclusive control of the territory in question throughout that time.

The Defendant also repeatedly maintained that the prosecution of this crime by the United States resulted from his being "unpopular," regularly incarcerated, and a crack user.  The Court specifically finds this not to be true.  The Defendant is an "Original Gangster," or a high-ranking member of the R.T.B. gang, a group whose primary activity is crack cocaine dealing, supported by their use of gun violence to exclude others from their exclusive market, and supplemented by robbery and theft.  Though the Defendant may have been incarcerated for other offenses in the past and may very well be a crack user, these things are irrelevant to this case.  The Defendant's "popularity" is not at issue in this case; his own knowing involvement and activities in support of a dangerous, violent street gang are the bases for the verdicts today.

For these reasons, and the reasons set forth in the Findings of Fact and Conclusions of Law of this Court, the Court has rendered verdicts of guilty on Counts 1

and 2 of the Indictment.  The Court has rendered a verdict of not guilty as to Count 9 of the Indictment, also for the reasons set forth in the Findings of Fact and Conclusions of Law of this Court.

Neither party has specifically addressed the total quantity of the crack cocaine that the Defendant is responsible for beyond the plain language of Count 1 that sets forth the charge of conspiracy to possess with the intent to distribute fifty or more grams of cocaine base, or crack cocaine.  The Court reserves the right to establish the quantity proven by proof beyond a reasonable doubt, as a jury would, whether that quantity is 150 to 500 grams, 500 to 1.5 kilos, 1.5 kilos to 4.5 kilos, or more than 4.5 kilos, which amounts correlate to offense level ranges from 30 to 38.  The Court observes, however, that there can be little, if any, doubt that the United States has established by proof beyond a reasonable doubt that the members of the conspiracy possessed more than 4.5 kilos with the intent to distribute them, even if only short periods of time between 1992 and 2007 are considered, based upon the record before the Court.  The Court assumes, absent agreement of the parties, that this issue will be argued to the Court at the time of sentencing on a briefing schedule to be agreed to by the parties or established by the Court.  The Court has ordered that a presentence report be prepared and will contact the parties to establish and date for the Defendant's sentencing.

D.W.F.